## Stephan's Estate.

Argued November 9, 1937.

Before KELLER, P. J., CUNNINGHAM, BALD-
RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Kenelm L. Shirk* and *Humbert B. Powell,* for appel-
lants.

*F. Lyman Windolph,* of *Windolph & Mueller,* and
*Harris C. Arnold,* with them *John A. Coyle* and *Bard
& Brown,* for appellees.

OPINION BY STADTFELD, J., December 17, 1937:

These are appeals from an adjudication and order of distribution in the estate of Mary Stephan, made by the Orphans' Court of Lancaster County, by ATLEE, P. J. of the Court of Common Pleas of Lancaster County, specially presiding.

Mary Stephan died on Nov. 7, 1934. The present controversy involves the residuary clause of her will, which is as follows: "Item VIII. All the rest, residue and remainder of my estate, real, personal and mixed, I give, devise and bequeath unto my hereinafter named Executors and Trustees, in trust nevertheless, the net income from which is to be paid to Camp Silver Bell, for the perpetual care and up-keep of the Stephan Spiritualists Memorial which is located on the grounds of the Ephrata Park Association. In the event that at any time Camp Silver Bell should be dissolved or go out of existence, I direct my hereinafter named Executors and Trustees to pay the corpus or principal of my estate toward the foundation and erection of a Spiritualists Old People's Home or Hospital, or if a Spiritualists Old Peoples' Home or Hospital is already erected, to pay the corpus or principal of my estate to the Trustees thereof absolutely."

The appellants are "Camp Silver Belle", "Stephan Memorial Hospital" and "Stephan Spiritualist Old People's Home." Camp Silver Belle is an unincorporated group of individuals who carry on a Spiritualistic enterprise at Ephrata, Pa. The Hospital and Old People's Home are non-profit corporations, formed after this litigation was in progress. The operators of Camp Silver Belle are incorporators of the two corporations.

The appellees are the heirs and next of kin of Mary Stephan. They take the position that the residuary clause of the will is void, and that they are entitled to

the entire estate under the intestate laws, after satisfaction of the specific legacies.

The court below found as a fact that neither Camp Silver Belle, nor the Stephan Memorial had been devoted to any religious, charitable, literary or scientific use, and ruled that the trust gift, violated the rule against perpetuities, and was therefore void. No assignment of error in this court challenges that finding. ✓

The court also ruled that the gift over for the hospital or home was void for remoteness, since there was no requirement that it must vest within lives in being and twenty-one years. Therefore, the residuary estate was awarded to the next of kin. These appeals on behalf of the Stephan Memorial Hospital, Stephan Spiritualist Old People's Home, and Camp Silver Belle, followed.

Appellants contend: I. that the facts brought out in the testimony, as well as the will itself, clearly express the intention of the testatrix as a desire to give the residue of her estate for charitable purposes under control of persons of the spiritualist faith: II. that under the cy pres doctrine relative to the construction of charitable bequests in wills, the province of the court is to construe the will so as to best carry out the intention of the testatrix; III. that any construction of the will of the testatrix to prevent the gift in remainder for spiritualist purposes would be contrary to the constitutional provisions protecting free religious worship.

At the very outset it may be proper to state that the merits or demerits of Spiritualism are not involved. No religious issue is involved, nor is there any question of public policy. Some references appear in appellants' brief to the guarantees of religious freedom under the Constitution of the United States and under the Constitution of Pennsylvania. The First Amendment to the Constitution of the United States provides that Congress shall make no law respecting an establishment

of religion or prohibiting the free exercise thereof, and is plainly irrelevant in the present connection. Section 3 of Article I of the Constitution of Pennsylvania provides that all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship. Neither the text of the Constitution of the United States nor that of the Commonwealth of Pennsylvania, nor the cases construing the same, appear to have any bearing on the issue before the court in this appeal. The sole question is the construction of the will of the testatrix and whether the provisions of paragraph VIII are in contravention of any rule of law of the Commonwealth of Pennsylvania.

The court below found as a fact and as a conclusion of law that the purposes of the trust were not religious, charitable, literary or scientific, and as we have pointed out, neither that finding nor the conclusions are challenged in this court by any assignment of error. Waiving the absence of any assignment of error, an examination of the record fully sustains the court's action.

From Par. VIII of the Will, we gather the following facts: 1. The gift is a trust, and only the income is to be expended. Camp Silver Belle is merely the trustee; 2. The trust is perpetual, i. e., for the perpetual upkeep of a memorial. No limitation of time is imposed. Only upon the uncertain contingency of the dissolution of Camp Silver Belle, which may never occur within any ascertainable period, would there be a disposition of the principal. There is no attempt to measure the time by any life in being; 3. The trust is for the purpose of

maintaining a specific "memorial, which is located on the ground of the Ephrata Park Association". There is no indication on the face of the will that the trust has any religious or charitable purpose whatever. It is most nearly like a trust for upkeep of a tombstone. That is, a purely private purpose *(Deaner's Estate,* 98 Pa. Superior Ct. 360), and may be the subject of a perpetual trust only by virtue of the Act of May 26, 1891, P. L. 119, which applies only to the care and maintenance of cemetery lots. Trust for other memorials are not protected by the act: *Palethorp's Est.* 249 Pa. 389, 94 A. 1060.

Thus, on the face of the will, no religious or charitable purpose is disclosed with respect to this trust. The gift is not to Camp Silver Belle outright, nor for its own use. The Camp is made a trustee to spend the income for a single purpose—the upkeep of a specific memorial at a specified place.

Thus we have a gift in trust for the perpetual upkeep of a specific memorial, with no evidence on the face of the will or in the record that the purposes of the trust are either religious or charitable. If this is the correct construction of the will, the nature of the activities of Camp Silver Belle are unimportant; it is but the trustee.

However, even if the trust should be regarded as a gift to Camp Silver Belle for promotion of its general activities, the evidence amply sustains the court's finding that the purposes are neither religious nor charitable and therefore may not be made the objects of a perpetual trust.

The argument is advanced by appellants that the association known as Camp Silver Belle possesses "the characteristics of a religious body", and that "the spiritualists' doctrines as practiced by the claimants are not contrary to public policy". These arguments

402

make it necessary to refer to the testimony on which the finding of the court below was based.

Appellees called as their witnesses Andrew M. Parker and Miss Rose Mackenberg. Mr. Parker is an employee of the Philadelphia Record, and at the time of the trial was on leave of absence from his paper and was engaged in broadcasting. Miss Mackenberg has had a long and varied experience in the investigation of asserted spiritualistic phenomena, and was associated for several years in the work of the late Harry Houdini. In the year 1934 she was employed by the Philadelphia Record to act in connection with Mr. Parker in investigating mediums in and around Philadelphia. Camp Silver Belle was one of the subjects of this investigation.

In the month of August, 1934, Mr. Parker and Miss Mackenberg made a visit to Camp Silver Belle and found that the person who appeared to be in charge of its activities was a certain Mrs. Ethel Post, who claimed to be a medium and with whom were associated her husband, Dr. Post, a Mrs. Jefts, a Mr. Macbeth, a Mrs. Cushing and a Dr. Lauman, some of whom also claimed to be mediums. Mr. Parker and Miss Mackenberg presented themselves at the camp as Mr. and Mrs. Ray Cord (a play on the word "Record"). (It should be mentioned in passing that Silver Belle is said to be the spirit of a little Indian princess who acts as a medium or guide for Mrs. Post, and that the spelling Silver Bell, which appears both in the will and in the notes of testimony is, accordingly incorrect.)  Except for certain public services at which a collection is taken, the various mediums charge fees for the exercise of their powers. Mr. Parker and Miss Mackenberg testified, among others, to the following deceptions.

At the public meeting which both witnesses attended on their first visit to the camp, Mrs. Post gave a demonstration which consisted of the reading of sealed mes-

sages. The so-called messages, really questions, were placed by members of the audience in sealed envelopes and were delivered to Mrs. Post, who undertook to read the question and then to get in touch with the spirits for whom the questions were intended and bring back the answers. Upon announcement of the answers the envelopes were returned with the seals unbroken to the persons who had prepared them. Mr. Parker propounded a question to an imaginary Ray Cord, Sr., supposed to be his deceased father, and was careful to write the question very lightly. Contrary to the usual practice, neither the envelope nor the card on which the question was written were returned to him but the question, which was about the sale of certain railroad bonds, was answered by Mrs. Post, who told him that he was to dispose of the bonds. Afterwards at a seance, devoted to materialization, the spirit of Ray Cord, Sr., appeared. Mr. Parker asked the spirit whether he remembered the fishing trips which they had been accustomed to take together and the spirit answered that he had not forgotten them. Still later, in the course of a demonstration of spirit writing given by Macbeth, the witness was handed a written communication from Ray Cord, Sr. The question enclosed by Miss Mackenberg in the sealed envelope was addressed to another imaginary character named Mabel, and inquired whether Mabel had recovered from her operation and was happy in the spirit land. In this case the envelope was returned with the seal unbroken and the oral answer was made that Mabel "was very happy" and that she was "getting along fine in the spirit land". Miss Mackenberg noticed that the envelope which was returned to her was damp. Her conclusion was that the envelope had been rendered transparent by a method which Mr. Parker was able to demonstrate in court.

Previous to the first visit of Mr. Parker and Miss Mackenberg to Ephrata they had attended a trumpet

seance given in Philadelphia by a medium named Anna K. Rose. Mrs. Rose was at Ephrata at the time of their first visit to Camp Silver Belle. They spoke to her and arranged for another meeting with her in Philadelphia. In the course of this second meeting Miss Mackenberg asked for a message from an imaginary deceased aunt, referred to as "Aunt Sarah" and Mr. Parker and Miss Mackenberg, still posing as Mr. and Mrs. Ray Cord, asked for a message from their dead little boy, whose supposed name was either Bobby or Billy. This information was given to no one but Mrs. Rose. On a later visit to Ephrata, Aunt Sarah was materialized for the benefit of Miss Mackenberg, who addressed her in German, and Aunt Sarah answered that she was getting along fine and was at peace. The mythical Bobby was also materialized and called attention to a glowing star on his forehead. When asked about it he explained that he had gotten this star because he had been very good in the spirit land and had been promoted.

On the occasion of their second visit to Ephrata, Mr. Parker and Miss Mackenberg attended an exhibition in which the medium, on this occasion Mrs. Post, was blindfolded and answered written questions, not in sealed envelopes, which were placed before her. Mr. Parker addressed a question to one Bill Hawkes, a living person and at that time the managing editor of the Philadelphia Record. The question was whether the witness should go ahead and reveal his findings about spiritualism. The question was not answered at that time. Afterwards, however, Macbeth, one of the mediums at the camp, was conversing with the witness when he suddenly started and asked whether the witness knew anybody named Bill Hawkes. On the receipt of an affirmative answer he said that the spirit of Hawkes was very strong and that his answer to the question was that the witness should go ahead and work for the cause and reveal his wonderful findings in spiritualism.

Macbeth added by way of explanation that the message had come to him through a spirit known as "Toby", a former priest, who was his medium.

After the completion of the so-called blindfold reading the witnesses attended another manifestation known as the "dark circle", which was in charge of Dr. Lauman. Fifteen or twenty people assembled in a room which was in inky blackness and were requested to report to the medium for interpretation whatever they might see or hear. Neither Mr. Parker nor Miss Mackenberg actually saw anything. Nevertheless Miss Mackenberg said she saw a dog. Then somebody else in the meeting saw the dog, and one person heard him bark. Dr. Lauman interpreted these reports until a dispute arose over the identification of the spirit which had manifested itself in the dog, whereupon the medium led the disputants out of trouble.

Mr. Parker and Miss Mackenberg requested Macbeth to give a demonstration of spirit writing, in which he was an adept. He asked Mr. Parker to write a message, so that he could get vibrations from it. Pursuant to this request Mr. Parker did write a message, which he addressed to the spirits of Pat O'Brien and Bill Farson (incorrectly referred to in the testimony as Parson). Pat O'Brien is a reporter on the Philadelphia Record and Bill Farson is a publicity man in Philadelphia. The message consisted of an inquiry as to whether the two spirits blamed Mr. Parker because he had happened to be driving the automobile at the time of the accident in which they were killed. The message was written on a sheet of paper, in the fold of which Mr. Parker had placed two or three hairs from his own head, and was then sealed in an envelope. The envelope was returned by Macbeth with the seal unbroken, but when it was opened by Mr. Parker the hairs were no longer in it. On the evening of the same day, the witnesses attended the materialization already referred to and the

spirit of Pat O'Brien appeared. The spirit said that it had not been through Mr. Parker's fault that the accident had happened, that he and Farson were in heaven and hoped that the witness would join them soon; and they played cards a little bit and even had a drink once in awhile.

In certain instances the witnesses saw the mechanical devices by which the frauds of the mediums were perpetrated. In what is known as a platform performance, conducted by Mrs. Post, and in which the medium is not blindfolded and does not receive written questions, but purports to communicate with the spirits of the friends and relatives of the people in the audience and to report the results of these communications, both Mr. Parker and Miss Mackenberg observed that the medium obtained information from a "gadget" concealed in a handkerchief which she held in her hand. This gadget, known as a reader, is manipulated with the fingers, and Miss Mackenberg saw it manipulated by Mrs. Post. On another occasion both witnesses saw a small stone by which Macbeth produced the rapping attributed to the spirits with whom he was supposed to be communicating.

The whole of the above testimony, and much more to the same effect which may be found in the record, was wholly uncontradicated.

Appellants cite numerous cases which have applied the cy pres doctrine to prevent the failure of trusts given for religious and charitable purposes. But cy pres is applicable, if at all, only after it has been determined that the gift was made for a charitable or religious purpose. It cannot be invoked to transform a non-charitable into a charitable trust, nor to take the trust out of the operation of the rule against perpetuities. Consequently cy pres has no application here.

Thus the record clearly sustained the findings that

the purposes of the trust are neither religious nor charitable.

The meaning of the will is clear with respect to the executory gifts over for the hospital or old people's home. No extrinsic evidence is needed and no rules of construction need be invoked.

As to this gift as well as to the prior trust, the following language of the Supreme Court in *Friday's Estate,* 313 Pa. 328, 170 A. 123, is pertinent: (p. 333) "Testator's motives are unimportant except as they indicate a desire to cause an infraction of the rule (against perpetuities) ...... (p. 336) To talk of dominant or primary intentions of testators in connection with his measure of the duration of the trust would. lead the court into refinements pregnant with litigation. The question is not what the testator most wanted as between the thirty year period and the period of the lives of his children and grandchildren living at his death, but rather *what did he say, and what is the plain meaning thereof.* ......:" (Italics supplied).

The will directs in clear language that this gift shall become effective if, and only if, Camp Silver Belle shall be dissolved or go out of existence. Camp Silver Belle was in existence when Mary Stephan died. Appellants insist that it is still in existence. But however that may be, the will must be construed in the light of facts as they existed at the time of Mrs. Stephan's death: *Friday's Estate,* supra; *Feeney's Estate,* 293 Pa. 273, 142 A. 284.

In the first place, therefore, since any vesting of the gift is dependent on the entirely uncertain event of the dissolution of Camp Silver Belle, the gift is obviously contingent.

Again, the will neither names or designates a hospital or home in which the future interest could vest prior to the dissolution of Camp Silver Belle; the trustees or the court would have to select an institution at that

time. The corporate appellants here were not in existence when Mrs. Stephan died. That makes the gift contingent: *Feeney's Estate,* supra.

It is equally clear that the gift over was not bound to vest within a life or lives in being and twenty-one years after the testatrix's death. The preceding trust is expressly made perpetual. The gift over might never vest. It could vest only upon dissolution of Camp Silver Belle. Obviously there is no certainty that that event would ever transpire, much less that it would have to occur within the period prescribed by the rule against perpetuities.

The Act of April 26, 1855, P. L. 328, Section 10, as amended by the Act of May 23, 1895, P. L. 114, Section 1, P. S. 10, Sec. 13, provides "No disposition of property [heretofore or] hereafter made for any religious, charitable, literary, or scientific use shall fail ...... by reason of ...... being given in perpetuity." The rule against perpetuities is not a rule of construction but a peremptory command of law, *Gerber's Estate,* 196 Pa. 366, 46 A. 497; and should be rigidly enforced, *Coggins' Appeal,* 124 Pa. 10, 16 A. 579.

"The rule (against perpetuities) is not one of construction, but a positive mandate of law to be obeyed irrespective of the question of intention. The proper procedure is to determine the true construction of the will, just as if there was no such thing in existence as the rule, and then to apply it rigorously in complete disregard of the wishes and intention of the testator" *Lockhart's Estate,* 306 Pa. 394, 159 A. 874; *Friday's Estate,* supra.

This gift falls completely within the plain terms of the rule against perpetuities—that unless a contingent gift must of necessity vest within life or lives in being, it is void for remoteness. The facts must be considered as of the date of the testatrix's death, and it is of no moment that the vesting may, perchance, occur within

the permitted period. The gift is void if, at the time of the testatrix's death, a vesting beyond the period was possible under the terms of the will: *Warren's Estate,* 320 Pa. 112, 182 A. 396; *Friday's Estate,* supra; *Feeney's Estate,* supra; *Penrose's Estate,* 257 Pa. 231, 101 A. 319, and cases there cited; *Ledwith v. Hurst,* 284 Pa. 94, 130 A. 315. That the gift over is for a charitable purpose does not affect the situation: *Ledwith v. Hurst,* supra; *Penrose's Estate,* supra; *Hillyard v. Miller,* 10 Pa. 326.

The first gift, in trust for the maintenance of the Stephan Spiritualist Memorial, is perpetual by the express terms of the will. Its purposes are not charitable, religious, literary or scientific.

That a perpetual, non-charitable trust violates the rule, needs no citation of authorities to sustain it. See *Palethorp's Estate,* supra; *Deener's Estate,* 98 Pa. Superior Ct. 360.

*Hillyard v. Miller,* supra, is a leading case. There a will provided a trust, unlimited in time, the income to be used as a loan fund for farmers and mechanics, and any surplus to be used to endow a hospital for widows and single women. The court held that the first provision was not charitable and therefore was void as a perpetuity; and that the second was void for remoteness, and that the heir was entitled to the whole fund.

In the course of the opinion in said case, Mr. Chief Justice GIBSON said: "...... What matters it, whether the testator limited the estate over, so as to retain it in his dying clutch, for a period longer than the law allows, for the vesting of an executory limitation; or, whether intending to clutch it forever, he did not limit it over at all? The mischief of indulging him would be the same, and the rule to restrain him must be the same ...... It is very true, that the invalidity of a subsequent contingent limitation will not defeat a pres-

ent absolute and valid one, as was held in *Carver v. Bowles,* 2 Russ & Mylne, 307. But, disconnect the present trust from the future charity, and what have we? Certainly not a present valid limitation, but a naked and invalid trust of indefinite continuance ......"

In *Philadelphia v. Girard's Heirs,* 45 Pa. 9, Chief Justice LOWRIE summarized the facts and law as set forth in *Hillyard v. Miller,* supra, as follows (p. 29); "...... In Peter Miller's will no charity at all was founded by the principal trust; but only a loan office for the benefit of farmers and mechanics, at the usual rate of interest, on real estate security, with continually accumulating capital, so long as there should be farmers and mechanics desiring to borrow; and, 'if, in the lapse of time,' the fund should accumulate beyond the demand for loans, then any surplus was to be devoted to a specified charity. It is quite clear that the secondary dependent trust was void, though a charity, because it might not become vested within the time allowed for the vesting of executory devises. And the primary trust was void because it was not a charity, and was not for the benefit of any particular persons or definite class of persons, and in fact conferred no benefit or charity at all, in any legal or equitable sense, seeing that all who were to accept its offers were to pay the usual price. It was, therefore, a mere trust for accumulation, without any ulterior object in view, except a very remote and accidental one. It would lead to incalculable absurdities to support such a trust. It was not of such character as to have any claims upon equity for its protection and support."

In *Ledwith v. Hurst,* supra, the court said at p. 99: "we are mindful of the rule that a charitable bequest may be given in perpetuity (authorities) but such bequest cannot be created by a gift over following a prior attempted disposition of the same property wherein

the rule has been violated: *Penrose's Est.* 257 Pa. 231; and see *Hillyard v. Miller*, 10 Pa. 326."

It follows as a matter of course that if the trunk of the tree falls, the branches fall with it.

In the instant case, we have a prior estate which violates the rule, and we have a charitable gift over, following the attempted prior gift which falls.

Both the prior trust and the ultimate gifts over violate the rule against perpetuities and being void, the lower court properly awarded the residuary estate to the next of kin.

The assignments of error are overruled and decree affirmed.