Borden et al., Appellants, *v.* Baldwin et al.

**578**

Argued April 29, 1971.   Before BELL, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Robert B. Ely, III* and *Peter Hearn,* with them *Alfred H. Wilcox, J. B. H. Carter,* and *Pepper, Hamilton & Scheetz,* for appellants.

*Patrick T. Ryan,* with him *Stewart Dalzell,* for appellees.

*Daniel W. Shoemaker,* in propria persona, for intervenor, appellee.

*John G. Williams,* in propria persona, with him *Shumaker, Williams & Placey,* for intervenor, appellee.

OPINION BY MR. JUSTICE EAGEN, October 12, 1971:

Before us for disposition are three interrelated appeals which grow out of the same factual background, a dispute among officers and members of a fox hunting club concerning the distribution of certain funds allegedly placed in trust by the club. We are asked to rule on the propriety of the lower court's action in sustaining preliminary objections in the nature of a demurrer to the petition to enforce distribution of the trust and in refusing to grant one of the parties here leave to intervene in that action.

For purposes of identification we shall hereafter refer to the Rose Tree Fox Hunting Club and its officers who are defending in this suit as "appellee"; the original petitioners who instituted this action in equity as "appellants"; appellant Richard Borden who sought and was denied leave to intervene in the proceeding as "Borden" and intervenor Shoemaker as "Shoemaker".

Appeal No. 186 was taken by appellants from the decree of the Court of Common Pleas, Orphans' Court Division, of Delaware County sustaining the preliminary objections and dismissing their petition. The appeals in Nos. 176 and 177 were taken by Borden from the aforementioned decree and from a decree of the lower court denying him leave to intervene in this action.

The Rose Tree Fox Hunting Club is an organization whose corporate existence dates back to the Nineteenth Century. Its purpose as a nonprofit corporation, set forth in the 1881 Delaware County Charter Book, is "to encourage riding and athletic sports among the members by the maintenance of a country resort for meeting . . . in Delaware County" and its principal activities are fox hunting and the conducting of horse

races. To further these purposes, the club had, since 1907, maintained a clubhouse on a large tract of land in Media.

By 1963 the urbanization of Delaware County had seriously diminished the ability of members to effectively pursue their sport. The huntsmen were also aware of the intentions of county authorities to take their land, by eminent domain if need be, for public recreational facilities. In the face of this predicament on December 16, 1963, thirty-five of the club's forty-eight active members met in the clubhouse for the assigned purpose "To discuss and take necessary action regarding the future of the Rose Tree Fox Hunting Club."

The upshot of that meeting was a series of adopted resolutions authorizing the directors to sell the club's property in Media and pay existing bank mortgages and debts of the organization. The balance of these proceeds was to be placed in trust. By its terms the trust income would be used for an experimental period of three years to support club activities in York County exclusively,[1] and at the conclusion of this period, the principal would be distributed to each of the active members as of December 16, 1963, who elected to withdraw his pro rata share and terminate his membership. Additionally, it was resolved that members joining after the date of this meeting would have no vested interest in the land then owned by the club or the proceeds therefrom.

Thereafter in 1966, the club property was sold to Delaware County in lieu of condemnation and the balance of the proceeds after the indebtedness was paid off, some $220,000, was deposited in an account entitled "Rose Tree Fox Hunting Club—Old Members' Equity." Income from this account was used to defray the ex-

---

[1] The club had been hunting in both York and Delaware Counties since the 1950's.

pense of activities in York, where incidentally the organization had become an immediate success attracting many new members.

However by the time the three-year trust period expired, a majority of the club was composed of York area members and the club under this new majority, took the position that it would not allow the old Philadelphia members to withdraw their shares. On September 17, 1969, an action was instituted to allow the old members to withdraw their shares in accordance with the declaration of trust.

After the commencement of this action and the filing of preliminary objections, the parties sought to reach a settlement which would avoid the expense of further litigation and restore harmony to the social club. In essence the plan of settlement would allow a Philadelphia member who so elected, to withdraw one-half the amount to which he would have been entitled under the 1963 resolutions, the balance to remain with the club.

The lower court refused to approve this settlement and thereafter sustained appellee's preliminary objections on the grounds that absent dissolution, the members had no vested interest in the net proceeds of the sale of club real estate in Media and therefore no trust could be created since the members did not own the trust res. It was also held that since the club was not formally dissolved, any distribution of funds would constitute a violation of the Nonprofit Corporation Code, 15 P.S. §7309. Borden's petition to intervene was denied by the court in its decree of November 5, 1970. These appeals followed.

## Nos. 186 and 177

We agree that the preliminary objections to the petition to enforce distribution were properly sustained

but for substantially different reasons than those assigned by the lower court.

It is well established that preliminary objections admit as true all facts which are well and clearly pleaded, but not the pleader's conclusions therefrom or averments of law: *Gardner v. Allegheny County*, 382 Pa. 88, 94, 114 A. 2d 491 (1955); *Narehood v. Pearson*, 374 Pa. 299, 302, 96 A. 2d 895 (1953). In *Catanese v. Scirica*, 437 Pa. 519, 521, 263 A. 2d 372 (1970), this Court reiterated with approval the rule that " ' " In determining whether or not [a summary] judgment should be or should have been entered [on a demurrer], two rules must always be applied: (1) The question to be decided is not whether the statement of claim is so clear in both form and specification as to entitle plaintiff to proceed to trial without amending it, but whether, upon the facts averred, it shows with certainty that the law will not permit a recovery by the plaintiff; and (2) Where a doubt exists as to whether or not summary judgment should be entered, this should be resolved in favor of refusing to enter it" ' "

It is evident from applicable law that a nonprofit corporation can create a trust. See 15 P.S. §7301.[2] In

---

[2] The Nonprofit Corporation Law, Act of May 5, 1933, P. L. 289, Art. III, §301, 15 P.S. §7301 provides: "*A nonprofit corporation shall have the capacity to act possessed by natural persons,* but shall have authority to perform only such acts as are necessary or proper to accomplish the purpose or purposes for which it is organized and which are not repugnant to law." (Emphasis supplied.) The Official Comment to this section states in pertinent part: "This section abolishes another prop of the ultra vires structure, namely, the doctrine that a corporation has a limited capacity measured by its statutory powers. This section, in effect, restores the common law rule that a corporation has the capacity of natural persons; that is, the capacity to do an unauthorized or even an illegal act." The extent to which §7301 circumscribes the activities of a nonprofit corporation need not be decided under our disposition of this case.

the present case it was Rose Tree Fox Hunting Club, as a corporate entity, rather than its members, which did in fact establish a trust from the proceeds of the sale of real estate.

As the facts indicate, the instant trust had two principal purposes: (1) to furnish funds for an experimental three-year period during which time activities would be conducted in York County in hopes that success there would keep the club in existence; and (2) to provide a mechanism by which members might retrieve their equity if they so desired at the end of the trial period.

Even the strictest interpretation of 15 P.S. §7301 would have to concede that part of the trust, the three-year income provision, did accomplish purposes for which the club was organized in that it permitted the club to transfer the locus of its activity rather than see it abandoned. Although this provision was valid, it expired by its own terms in 1969.

The distribution provision, however, is patently invalid for the reason that it contravenes the Nonprofit Corporation Law. To enforce such a provision would directly violate public policy. The corporation code will not suffer even a partial distribution of funds absent formal dissolution proceedings. 15 P.S. §7304 provides in pertinent part: "No dividends shall be directly or indirectly paid on any such shares [of a nonprofit corporation] nor shall the shareholders be entitled to any portion of the earnings of such corporation derived through increment of value upon its property, or otherwise incidentally made, *but upon dissolution of any such corporation the shareholders shall be entitled to a pro rata distribution of the assets thereof . . . .*" (Emphasis supplied.) Additionally, 15 P.S. §7309 states in relevant part: "All moneys so received or collected by any nonprofit corporation shall be applied to the main-

tenance and operation or the furtherance of the lawful activities of the corporation, *and in no case shall such moneys be divided or distributed in any manner whatsoever among the members of the corporation."* (Emphasis supplied.)

Palpably the membership was attempting through the corporate vehicle to achieve, inter alia, a future possible partial dissolution in the formulation of this trust. What was overlooked in the process is that the Nonprofit Corporation Law sets up a careful framework in 15 P.S. §8001 for the voluntary dissolution of such organizations.[3]

It has long been held in Pennsylvania, as elsewhere, that provisions in wills or trusts which contravene statutes or public policies are unenforceable. *Scholler Trust,* 403 Pa. 97, 169 A. 2d 554 (1961); *Wanamaker's Estate,* 335 Pa. 241, 6 A. 2d 852 (1939); *Devlin's Trust Estate,* 284 Pa. 11, 130 A. 238 (1925); *Manners v. Philadelphia Library Co.,* 93 Pa. 165 (1880); *Greenfield's Estate,* 14 Pa. 489 (1850); 1 Scott, Trusts, §§60-62 (2d ed. 1956).

In granting the privilege of incorporation to qualified nonprofit groups, the Legislature has rightfully imposed certain duties and safeguards, one of which is the requirement of formal dissolution before such corporation can disburse its funds to its membership. That which should have been done to bring about the desired result of distribution of pro rata shares was

---

[3] 15 P.S. §8001 provides that after a majority (or other) vote approval of a resolution authorizing the institution of voluntary proceedings, a nonprofit corporation may, upon application to the court of common pleas of the county in which its registered office is located, be dissolved and wind up its affairs. The petition which must be presented to the court is freighted with required information and the court, in the exercise of its discretion, can refuse its approval. Needless to say, none of this took place in the present case.

not, and for this reason the law will not permit recovery by appellants.

It necessarily follows that the same reasons which here militate against recognition of a cause of action to enforce an invalid trust also support the lower court's refusal to approve a settlement which envisioned partial payment of club funds.

## No. 177

The action of the lower court denying intervention to Borden is also affirmed. The rule of *Frey's Estate,* 237 Pa. 269, 271, 85 A. 147 (1912) [refusal of intervention may be considered a final order, where appellant can show that refusal to intervene denies him relief to which he is entitled and which he can obtain in no other way] has no application to Borden since neither he nor any of the old Philadelphia members are entitled to relief regarding trust implementation.

We believe that the instant case is a situation where although the trust must fail for illegality, the conduct of the settlor in creating the trust is not so blameworthy that there is any public policy which would preclude its recovering the property from the trust. See generally 1 Scott, Trusts §422.4 (2d ed. 1956); Restatement, Second, Trusts §422. For this reason a resulting trust arises in favor of the settlor, club.[4]

---

[4] Intervenor Shoemaker would have us apply the charitable trust doctrine of cy pres and direct that income from the corpus of the trust be used "to promote present club activities within the territories assigned by the Masters of Fox Hunts Association of America." Implicit in this suggestion is a misconception of the nature of the instant trust, for it is palpably not a charitable trust nor is the Rose Tree Fox Hunting Club a charitable organization. In *Stephan's Estate*, 129 Pa. Superior Ct. 396, 406, 195 A. 653 (1937), the court said, ". . . cy pres is applicable . . . only after it has been determined that the gift was made for a charitable or re-

In disposing of the case in this manner, we do not pass upon the issue of whether the 1963 resolutions had the effect of creating a proprietary class of members who alone are entitled to share in the proceeds of the 1966 sale of the land and clubhouse.[5] Such a contention could only properly be raised by the original petitioners-appellants in the event that the club is ever dissolved.

Decrees affirmed. Costs to be paid out by the Rose Tree Fox Hunting Club.

Mr. Justice JONES took no part in the consideration or decision of this case.

---

ligious purpose. It cannot be invoked to transform a noncharitable into a charitable trust. . . ." In *West Indies Mission Appeal*, 387 Pa. 534. 128 A. 2d 773 (1957) our Court, after reviewing the development of the theory of charitable corporations, said at page 540: "In view of these cases it may be safely said that whatever is gratuitously done or given in relief of the public burdens or for the advancement of the public good is a public charity. In every such case as the public is the beneficiary, the charity is a public charity." And in *Babb v. Reed*, 5 Rawle 151, 158 (1835), a charity was defined as follows: "Charitable uses . . . are of a public nature, tending to the benefit or relief . . . of the community at large, not restricted to the mutual aid of a few."

Neither the club nor its trust effects a benefit to anyone except its own members and for this reason the doctrine of cy pres has no application.

[5] Appellant Borden argued to this Court that Resolution No. 7 of December 16, 1963, created such a proprietary class. However, since his petition to intervene was correctly denied, he is not the proper person to make such a contention, nor, in the absence of dissolution, would it be proper to decide such an issue.