# Dundas's Appeal.

1. A testator gave the remainder of his estate real and personal to certain persons named, and gave his " executors full power to sell * * the whole or any part of my estate real or personal without application to * * any court, either for the purpose of effecting partition among the said devisees, or for the purpose of making a partition or division of any lands that I may own in common with others." This was a conversion of his real estate.

2. This broke the descent and vested the estate in the executors, leaving to the legatees but an interest in the proceeds.

3. The executors would be accountable for the real estate.

4. The Orphans' Court has power to control testamentary trustees in the exercise of powers over real and personal estate.

5. Executors sold real estate under the directions of a will and charged themselves in their account with the proceeds; on exceptions to their account the Orphans' Court had not power to order a resale.

6. The court might strike out the item or surcharge the executors with the price it should have brought.

7. If the court judged the sale ought not to stand they could strike out the item and order the charge to lie over, in order to prevent the parties from being estopped from contesting the sale.

8. The deed passed the estate to the purchaser and constituted a contract which could be reached only by a proceeding to which the purchaser was a party.

9. The Orphans' Court within limits of its jurisdiction is strictly a court of equity.

10. The Orphans' Court grasp a controversy in relation to a sale of real estate under a will, and may set aside the sale, order the purchase-money to be restored and direct a resale by the executors.

11. Executors sold real estate of the testator to the wife of one of them. The sale was not void because she was a married woman.

12. If the sale were avoided, it would be because she was the wife of one of the executors.

13. A married woman can take a deed with the assent of her husband.

14. A sale by a trustee to his wife would be set aside not on the ground of coverture, but of her relationship to the trustee.

15. The Orphans' Court has power to authorize a wife to bid at a sale by her husband as trustee of real estate in which she is interested.

16. The Orphans' Court could order the sale to be made by the trustee, under the supervision of its own officer.

17. The power to authorize a trustee to bid at his own sale is a delicate one, should be cautiously exercised and watched with jealousy.

18. To charge an executor with more than he receives, supine negligence or wilful default must be proved.

19. It seems that the Orphans' Court has power to review, set aside or order a resale of real estate under a testamentary power.

20. The 12th and 13th sects. of Act of February 24th 1834 (Executors, &c.), 4th and 57th sects. of Act of March 29th 1832 (Orphans' Court), and 19th sect. of Act of June 16th 1836 (Courts), construed.

21. McNair's Appeal, 4 Rawle 148, Morris's Appeal, 10 Barr 435, recognised.

February 25th 1870.   Before AGNEW, SHARSWOOD and WILLIAMS, JJ.   THOMPSON, C. J., at Nisi Prius.

Appeal from the decree of the Orphans' Court of *Philadelphia*: No. 261, to January Term 1870 ; in the matter of the account of Joshua Lippincott and James D. Lippincott, surviving executors, &c., of James Dundas, deceased.

The testator died July 4th 1865, without lineal descendants, leaving a will dated March 15th 1865, which was proved July 10th 1865.   After making a number of bequests and devises, he provided as follows, viz. :—

"12. All the remainder of my estate, real, personal and mixed, I order and direct to be divided into forty equal parts or shares, which I give and devise as follows, viz. : to my grandnephew, James Dundas Lippincott, 16 parts or shares ; to my grandniece, Anna Maria Dundas Lippincott, 12 parts or shares ; to my niece, Agnes Dundas Lippincott, 3 parts or shares ; to the children of my deceased brother, William L. Dundas, 5 parts or shares, to be divided among them in equal parts, the children of any deceased parent to take what the parent if living would have taken ; to the children of my deceased brother, John Dundas, 2 parts or shares, the child or children of a deceased parent to take the share the parent would have been entitled to if living ; to the children of my deceased brother, Henry Dundas, 2 parts or shares, the child or children of a deceased parent to take the share the parent would have taken if living.

"14. I give to my executors, hereinafter named, full power and authority to sell and dispose of, either at public or private sale, the whole or any part of my estate, real or personal, without application to the Orphans' Court or any other court, either for the purpose of effecting a partition among the said devisees, or for the purpose of making a partition or division of any lands that I may own in Schuylkill county, in common with others, or in carrying out the general purposes of this my will; and to execute and deliver all necessary deeds and conveyances for the purposes aforesaid, and without any liability on the part of the purchaser as to the application of the purchase-moneys ; and if circumstances shall arise in relation to the lands in Schuylkill county, rendering it expedient, in the opinion of my executors, for the better management or disposition of said lands, to create a joint stock company, or in any other way or manner take action with regard to them, which to them shall be manifestly for the interest of my estate, I fully empower them to take all necessary steps to that end. * *

"16. I hereby order and direct that all the powers of sale or investments created by or arising out of this my will, shall be executed without any application to any court of any county or jurisdiction in which my estate may lie ; and it is my will that my

said executors shall not be personally liable for the exercise of the said powers. Provided it be done with good faith and intention, each of my said executors shall be liable for his own acts only, and not for the acts of his co-executors, to which he has not consented. A majority of my said executors shall be competent to exercise all the powers given by this my will.

" 17. If any of my executors shall die, or decline the executorship, it shall be the duty of the acting executors to appoint another in the place of the executor so dying or declining, and to make such conveyances and do such acts as may invest the said substituted executor from time to time, as occasion may arise, with the same rights and powers which are given to the executors named in this my will."

He appointed Joshua Lippincott, Richard Smethurst and James D. Lippincott, executors of his will. Letters testamentary were issued to all the executors. Mr. Smethurst died April 18th 1867. The surviving executors filed an account April 27th, which was referred to W. H. Drayton, Esq., as auditor, to adjust, &c.

On the hearing before the auditor, a number of items in the account were contested. One related to the sale of a house and lot belonging to the testator, situated at the north-east corner of Broad and Walnut streets, Philadelphia. In the inventory this real estate was appraised at $110,000.

The executors being about to sell this property, Joshua Lippincott and Agnes D. Lippincott, his wife petitioned the Orphans' Court of Philadelphia, setting forth the will, the seisin of the testator of the premises mentioned, and proceeded :—

" And it is the purpose of the said executors to expose the said premises to public sale, at an early day. The petitioner, Agnes Dundas Lippincott, is desirous of purchasing the said premises, but by reason of the position of her husband as one of the executors of the said will, is advised that the leave of the court to bid at the said sale should first be obtained, which said leave the petitioners pray may be given to her accordingly."

The court, on the 10th of August 1865, ordered that the prayer be granted, and that the petitioner, Agnes Dundas Lippincott, have leave to bid for and purchase the said premises situate at the north-east corner of Broad and Walnut streets, at the public sale thereof advertised by the said executors.

The property was exposed to public sale, on the 27th of September 1867, at the Philadelphia Exchange, and struck down to Nalbro Frazier, as the agent of Mrs. Lippincott, for $130,000. The deed, under his direction, was made to Mrs. Lippincott on the 27th of October.

The executors, in their account, charged themselves with $130,000—the amount at which the property was sold. Agnes Dundas and two other residuary legatees urged before the auditor

that the sale was void, that the property had been sold below its value, and that the sale should be set aside or the executors surcharged with a large amount, the difference between the price at which the property was sold and its actual value.

There was much evidence taken before the auditor as to the advertising the sale, the manner in which it had been conducted, the actual value of the property, and other matters bearing upon the question of good faith in the executors in making the sale.

The auditor declined to report that the sale should be set aside or the accountants surcharged with any sum on account of the property.

Exceptions were filed to the report. The Orphans' Court (Ludlow, J.) surcharged the executors with $20,000—the difference between the price paid for the property and its full value, with interest from the day of sale.

The residuary legatees and the executors appealed.

The legatees, besides other specifications, assigned for error that the court erred :—

1. In not ordering a resale of the premises, No. 1333 Walnut street.

2. In deciding that Mrs. Lippincott, the wife of one of the executors, might bid and purchase the premises, No. 1333 Walnut street, under the previous order of the Orphans' Court, permitting her so to do, which order was itself illegal and invalid.

3. In surcharging the accountants only with the sum of $20,000 and interest, on account of the alleged sale of the house and premises, and in not surcharging them with the further sum of $100,000, on account of the said premises.

The executors assigned for error the surcharge of $20,000.

*A. M Burton* and *Porter*, for legatees.—A purchase by trustees at a public auction cannot be sustained, for if persons who are trustees to sell are there professedly as bidders to buy, it is a discouragement to others to bid. The persons present seeing the seller there to bid for the estate to or above its value, do not like to enter int that competition : Ex parte Lacy, 6 Vesey 626, notes at end; Ex parte James, 8 Id. 337; Downes *v.* Grazebrook, 3 Merivale 209; Nelthorpe *v.* Pennyman, 14 Ves. 517. When at a public auction the seller's agent bid for the plaintiff, held that it hurt the sale : Twining *v.* Morrice, 2 Bro. Ch. C. 326 ; Pennock's Appeal, 2 Harris 446 ; Crowder *v.* Austin, 3 Bing. 368 ; Thornett *v.* Haines, 15 M. & W. 367. The court should have set aside the sale. Mrs. Lippincott was a purchaser in a fiduciary capacity : Beck *v.* Uhrich, 1 Harris 638 ; Hill on Trustees 92, and note on pp. 147, 148 ; 2 Story's Eq. J., §§ 1257, 1260, 1261, 1263, 1280, and 1280 *a.* An executor or trustee who buys at his own sale, holds the lands on the same trusts to which it was subject before :

[Dundas's Appeal.]

Shuman's Appeal, 3 Casey 64. The ordinary relief consists in ordering a resale of the property: 1 Leading Cases in Equity 219, Am. note; Guier *v.* Kelly, 2 Binn. 294. The Orphans' Court, in matters within their jurisdiction, proceed on the principles of a court of chancery: McPherson *v.* Cunliff, 11 S. & R. 429; Shollenberger's Appeal, 9 Harris 340; Ashford *v.* Ewing, 1 Casey 215; Horner *v.* Hasbrouck, 5 Wright 178. When a trustee fails to take measures to secure the best price, or his course operates against the sale, and to prejudice the interests he represented, the sale will be set aside: Howell *v.* Sebring, 1 McCarter (N. J.) 85. Declarations of husband, that property purchased by the wife belonged to her, will not vest the property in the wife against the next of kin of the husband: Bradford's Appeal, 5 Casey 513; Rhoads *v.* Gordon, 2 Wright 277; Curry *v.* Bott, 3 P. F. Smith 400; Baringer *v.* Stiver, 13 Wright 131, citing Gault *v.* Saffin & Wife, 8 Id. 307; Robinson *v.* Wallace, 3 Id. 132, 133.

Mrs. Lippincott held in common with other legatees, and a purchase by her enures for the benefit of the others: Devoue *v.* Fanning, 2 Johns. Ch. 252, 268; 1 Lead. Cas. in Eq. 95; Michoud *v.* Girod, 4 Howard 556, 558; Campbell *v.* Penna. Life Ins. Co., 2 Whart. 63; Smiley *v.* Dixon, 1 Penna. R. 440; Weaver *v.* Wible, 1 Casey 270; Vanhorne *v.* Fonda, 5 Johns. Ch. 407; Lloyd *v.* Lynch, 4 Casey 419; Keller *v.* Auble, 8 P. F. Smith 410. Mrs. Lippincott is affected with notice of the irregularity of the sale, on the face of her title: Ward *v.* Smith, 3 Sand. Ch. 592; Chronister *v.* Bushey, 7 W. & S. 152. If the executor is associated with others in his purchase they stand on no better ground: Paul *v.* Squibb, 2 Jones 296. The equity of the cestui que trust is superior to that of a co-purchaser who had full notice of the trust: Rosenberger's Appeal, 2 Casey 67, 69. The decree could not give Mrs. Lippincott power of making a contract to bind herself: Pennock's Appeal, 2 Harris 451; Kirkland *v.* Hepselgefser, 2 Grant 84; Keen *v.* Coleman, 3 Wright 299; McClure *v.* Douthitt, 6 Barr 414; Glidden *v.* Strupler, 2 P. F. Smith 400; Williams *v.* Coward, 1 Grant 21; Glyde *v.* Keister, Id. 465; Dunham *v.* Wright, 3 P. F. Smith 167; Rumfelt *v.* Clemens, 10 Wright 455; Steinman *v.* Ewing, 7 Id. 63; Keiper *v.* Helfricker, 6 Id. 325; Heacock *v.* Fly, 2 Harris 540; Patterson *v.* Robinson, 1 Casey 83; Schlosser's Appeal, 8 P. F. Smith 493; Ramborger *v.* Ingraham, 2 Wright 146. This was a purchase by the husband in the name of the wife, from himself as the trustee to make the sale: Devoue *v.* Fanning, 2 Johns. Ch. 252; Michoud *v.* Girod, 4 How. 503; Campbell *v.* The Pennsylvania Life Ins. Co., 2 Whart. 63; Shuman's Appeal, 3 Casey 64. The Orphans' Court by this decree could not conclude those who were not parties to it: Com. *v.* Rogers, 3 P. F. Smith 470; McKee *v.* McKee, 2 Harris 231; Newcomer's Appeal, 7 Wright 43.

*G. W. Biddle*, for the executors.—The sale is not *absolutely void:*
Beeson *v.* Beeson, 9 Barr 282 ; Baxter *v.* Smith, 6 Binn. 427 ;
Patterson *v.* Robinson, 1 Casey 82 ; Conrad *v.* Shomo, 8 Wright
194 ; Baringer *v.* Stiver, 13 Id. 132.   A trustee may purchase
by consent of the court, at its own sale : Fox *v.* Mackreth, 1 L. C.
in Equity, Am. note 117.

The opinion of the court was delivered, May 5th 1870, by
AGNEW, J.—The principal question in this case is presented
by the 1st assignment of error, that the Orphans' Court erred in
not ordering a resale of the premises No. 1333, on Walnut street.
The sale was made under a power contained in the will of the late
James Dundas, authorizing his three executors, or a majority of
them, to sell his real estate at public or private sale.   Under the
13th section of the Act of 24th of February 1834, this will vested
in the executors the same powers and authority over such estate,
for all the purposes of sale and conveyance, and also of remedy
by entry, action or otherwise, as if the same had been devised to
them to be sold : Purd. 282, pl. 62.   In *pari materia* is the 12th
section of the same act, which vests in the executors all powers,
authorities and directions relating to real estate, not given to any
one by name or description, but requires these powers, &c., to be
exercised under the control and direction of the Orphans' Court
having jurisdiction of the account of the executors : See Wood's
Estate, 1 Barr 371.   According to numerous decisions, the effect
of such a power of sale, in a will, is to convert the realty into
personalty, so much so that the interest of the heirs is not liable
to lien or sale by the sheriff : Allison *v.* Wilson, 13 S. & R. 332 ;
Morrow *v.* Brenizer, 2 Rawle 188 ; Hannah *v.* Swarner, 3 W. & S.
230 ; Silverthorn *v.* McKinster, 2 Jones 72.   It broke the descent
(said Judge Bell in the last case), and vested the estate in the
executors, leaving to the legatees but an interest in the proceeds.
Unquestionably the effect of this legislation and these decisions
is to render the executors accountable for the real estate thus
placed in their hands for sale, conferring in this respect a charge
and management of it.   The 4th section of the Act of 29th March
1832, relating to Orphans' Courts (Pamph. L. 190), provided that
the jurisdiction of the Orphans' Courts should extend to and em-
brace (*inter alia*),  "generally all cases within their respective
counties, wherein executors, administrators, guardians or trustees
are or may be possessed of, or undertake the care and manage-
ment of, or are in any way accountable for any real or personal
estate of a decedent, and such jurisdiction shall be exercised in
the manner hereinafter provided."   The 19th section of the Act
of 16th June 1836, relating to the jurisdiction and powers of the
courts (Pamph. L. 792), is a substantial re-enactment of the same
provisions, though not exactly word for word, as stated by Gib-

son, C. J., in Lewis v. Lewis, 1 Harris 82. The Act of 1836 omits the words "or undertake the care and management of." It is an evident, but immaterial omission, as the Act of 1836 contains no repealing clause. This provision of the Act of 1832 has undergone judicial scrutiny in Wimmer's Appeal, 1 Whart. 96; Fretz's Appeal, 4 W. & S. 433; Brown's Appeal, 2 Jones 333; Lewis v. Lewis, 1 Harris 79, and perhaps in other cases, in all which the powers of the Orphans' Court are looked upon with favor, on account of their necessity and their fitness. It would appear from this legislation that the Orphans' Court has power to control executors and other testamentary trustees in the exercise of their powers over real and personal estate. There would seem to be good reason, therefore, to hold that the Orphans' Court has power to review, set aside, and if necessary to order a resale of real estate made under a testamentary power. But the learned judge of the Orphans' Court supposed too much when he asserted that it might be his duty to order a resale in the case then before him. The settlement of the account of the executors was all he had before him, and he could do but one of two things, either strike the charge for the proceeds of the sale of the house and lot No. 1333 out of the account, or surcharge the executors with the additional price it would have brought at a fair sale. He would do the former if he thought the sale ought not to stand, and order the charge to lie over for a future settlement, in order to prevent the parties interested from being estopped from contesting the sale. He would do the latter if he thought a surcharge only should be made.

That he could not set aside the sale and order a resale is evident from several considerations. The parties were not all before him. This was a sale by authority of the testator, and needed no confirmation of the court, or order to convey. The deed passed the estate directly to the purchaser, and constituted an inviolable contract, which could be reached only by a judicial proceeding to which the purchaser should be a party as well as the executors. By the express terms of the Act of 1832 the power of the Orphans' Court could be exercised only according to its direction, to wit: "Such jurisdiction shall be exercised in the manner hereafter provided," or according to the Act of 1836: "And such jurisdiction shall be exercised under the limitations, and in the manner provided by law." That manner is set forth in the 57th section of the Act of 29th March 1832, which prescribes that "the manner of proceeding in the Orphans' Court to obtain the appearance of a person amenable to its jurisdiction, and to compel obedience to its decrees, shall be as follows: "On the petition to the court of any person interested, whether such interest be immediate or remote, setting forth facts necessary to give the court jurisdiction, the specific cause of complaint, and the relief desired

[Dundas's Appeal.]

and supported by oath or affirmation, the Orphans' Court, or any judge thereof in vacation, may award a citation returnable at a day certain, not less than ten days after the issuing thereof," &c. Conceding then, for argument's sake, that the conveyance to Mrs. Agnes Dundas Lippincott was an unfaithful performance of the testamentary authority, because she is the wife of one of the executors, yet here is the deed to her made under the authority of the will for a valuable consideration, passing from her into the hands of the executors, which cannot be set aside except by a proceeding to call her in as well as the executors. Clearly the jurisdiction of the Orphans' Court can be exercised only on petition of the complainants, setting forth the will, the power and the execution of it, and the specific cause of complaint, in order to bring in the parties to answer the specific charge, and to enable the Orphans' Court to make them answerable to its jurisdiction, and to enforce its decrees. The Orphans' Court, within the limits of its jurisdiction, is strictly a court of equity (says Gibson, C. J.), proceeding by petition and answer, and enforcing its decrees by attachment, sequestration or execution, as the case may require: Lewis v. Lewis, 1 Harris 82; Wimmer's Appeal, 1 Whart. 104. In such a proceeding the Orphans' Court can grasp the controversy, set aside the sale, order the purchase-money to be restored, and direct a resale by the executors under the will. The sale to Mrs. Lippincott is not void because she is a married woman. It could be avoided only on the ground that she is the wife of one of the executors, and even then she would be entitled to a return of the price she had paid. That a married woman can take a deed with the assent of her husband is law as old as Lord Coke's time. See authorities collected in Williams' Appeal, 11 Wright 309, 310; also Bortz v. Bortz, 12 Id. 382, and Cowton v. Wickersham, 4 P. F. Smith 302. It is evident, therefore, that in a proceeding merely to adjust the account of the executors, and ascertain a balance for distribution, to which the purchaser of the real estate is no party, in which the parties have not been brought in to answer a specific complaint against the sale itself, and in which no decree can be made to embrace the whole controversy, the Orphans' Court cannot set aside the sale and order a resale. If, in the judgment of the court, it should be necessary to proceed against the sale itself, instead of striking the charge out of the account, it would have the power to suspend the settlement, and order the exceptants to proceed at once to contest the sale.

The next assignment of error relates to the right of Mrs. Lippincott to purchase under the order of the Orphans' Court permitting her to become a bidder. We cannot doubt that a sale by a trustee to his own wife would be set aside on the application of the cestui que trust, not on the ground of coverture, but of her relationship to the trustee. It would be evidence of unfairness

quite as much as if the sale were made to the trustee himself, and falls within the spirit of the rule which forbids his own purchase: Hill on Trustees 535, 536; Lewin on Trusts 376 to 383; 2 Story's Eq. §§ 1257, 1261, 1265. But we cannot agree that the Orphans' Court has no power to make the order permitting Mrs. Lippincott to bid. The jurisdiction is conferred by the 4th section of the Act of 1832, already referred to. Joshua Lippincott, the executor, was vested with the estate, and made accountable for the execution of his power to sell it, and the petition of Mrs. Lippincott concerns his execution of the power, and his accountability for the estate sold. Mrs. Lippincott's right to purchase was distinct from her husband's power to sell, and but for the influence of her relation upon him, she had a right to bid for the property. If for any sufficient reason it became necessary for her to exercise her personal right, such an order would be necessary to protect the estate, the trustee and her purchase; while it would draw the sale directly within the power of the court to supervise it to the interest of all concerned. If necessary, the court could order it to be made by the trustee under the supervision of its own officer. The Orphans' Court, within the scope of its powers, proceeds as a court of equity, and there ·· authority to show that a court of chancery may, on bill filed, allow a trustee to bid at his own sale; and the reason undoubtedly is, that the bill draws to the court the supervision of the sale under such directions as the chancellor may deem necessary to protect the interests of every one concerned: Campbell *v.* Walker, 5 Vesey Jr. 678; Michoud *v.* Girod, 4 Howard 557–58; Lewin on Trusts 381, 382; Hill on Trustees 536. The power is a delicate one and should always be cautiously exercised, and the sale itself watched ‚with jealousy. In this case the order to permit Mrs. Lippincott to bid was made in August 1865, the sale in September, and the deed delivered in October 1865, and Mrs. Lippincott entered into immediate possession. These facts were known to the appellants, yet no steps were taken to set aside the sale, and the first time when objection is raised was in the settlement of the account in 1867. Under these circumstances, the auditor having found no fraud or unfairness in the sale, and the court having no power in this proceeding to order a resale, it was not error in the court to rely on its own order permitting Mrs. Lippincott to bid, and to surcharge the executors with the full price the premises would have brought at a fair sale, instead of striking out the charge from the account, and sending the parties to a proceeding to set aside the sale. This does justice to all the parties.

The fact that the auditor found no fraud or unfairness, and that this finding was sanctioned by the court, had great weight in the decision of the case. The measure of liability to which the appellants can hold the executors is that only which the testator

[Dundas's Appeal.]

himself exacted. They enjoy nothing of his except under his will, and can claim no higher duty of his trustees than he did. The will is the law of their rights as of the executors' duties. James Dundas gave his executors a large discretion. Two of the three could execute the power, they could sell at private as well as at public sale. They could sell on his authority alone without leave of any court; and he expressly willed that they should not be personally liable for the exercise of these powers, provided their acts were done in good faith and intention. There being no creditors, he had a right to say that this should be the measure of liability as to those who claim his bounty. This is fully settled by McNair's Appeal, 4 Rawle 148, where the distinction is expressly taken between creditors and legatees, and fortified by authority. In Moore's Appeal, 10 Barr 435, Judge Rogers laid down the rule, " that a trustee is not liable for more than he receives of the profits of the estate, for he is considered in the character of a stakeholder or bailee. If you wish to surcharge them beyond the actual profits you must prove satisfactorily supine negligence or willful default." This was approved of in Springer's Estate, 1 P. F. Smith 344; and see Konigmacher v. Kimmel, 1 Penna. 207 ; Calhoun's Estate, 6 Watts 185. Looking at the circumstances and the will, we think the court went as far as the evidence warranted, in surcharging the executors, a surcharge justifiable under the evidence only on the ground that the purchaser was the wife of one of the executors, making it the duty of the court to scrutinize the exercise of the power of sale with extreme vigilance.

All the other exceptions appear to have been disposed of by the court correctly, in view of the terms of the will, and the decree of the Orphans' Court is therefore affirmed at the costs of the appellants.