## Fraiman Estate

*Kiefer N. Gerstley,* for accountant.

*William L. Huganir, Alan Miles Ruben, Melvin Rubin, Morris Gerber, Joseph Knox Fornance, Philip R. Detwiler* and *High, Swartz, Childs & Roberts,* for claimants.

*Edward J. Ozorowski,* Special Deputy Attorney General, for Commonwealth.

TAXIS, JR., P. J., May 4, 1961.—The account shows a balance for distribution of $225,713.37, composed of U. S. Savings Bonds totalling $945.30, U. S. Treasury Bills totalling $29,808.90, a cause of action against Pennsylvania Turnpike Commission, inventoried at $35,000, and cash.

Decedent died on February 10, 1959, leaving a will dated January 1, 1959. The will bequeathed $1,000 to Harold L. Rosenberger, then placed the residue in trust for Yeshiva University, New York. Mr. Benjamin Cohen was appointed executor and Melvin Rubin, Esq., was designated as trustee.

The first question requiring determination by this court relates to counsel fees to be paid to Melvin Rubin, Esq., who was counsel for executor. Mr. Rubin requests a fee of $28,205.03, of which $7,500 has been paid.

Decedent was a scrap iron dealer and had contacted Melvin Rubin, Esq., in November 1958, to prepare his will. After several drafts the present will was executed. Mr. Rubin also advised decedent prior to his death in regard to other matters. After death, Mr. Rubin arranged for decedent's funeral and the probate of the will.

Collecting the assets for administration was difficult because there was a large inventory of scrap iron on decedent's premises at South York Road and the Pennsylvania Turnpike, Hatboro. Mr. Rubin negotiated a sale of the scrap at a price of $25,090, after contacting many scrap dealers to solicit bids. The purchaser was Mr. Harry Phillips. This sale was made after weeks of negotiation during which Mr. Rubin met with at least 18 different scrap dealers including most of the important scrap dealers in the Philadelphia area. The scrap iron on the premises covered an area of over five acres and the value was discernible only to people familiar with the scrap business. The court is convinced

that Mr. Rubin adequately handled this rather precarious situation. The first offer was $7,000, and by negotiation Mr. Rubin, by reason of his diligence and industry was able to consummate a sale of the scrap for $25,090. Thus, a highly beneficial result was achieved.

Decedent was a peculiar person and certain peculiarities complicated the administration of his estate. The watchmen and Mr. Rubin made an unsuccessful search for buried gold that was supposed to have been buried by decedent on the premises. Decedent's papers were scattered at the time of his death. Some papers were found in a safe deposit box in the Philadelphia National Bank branch in Hatboro, some papers were found at decedent's premises, and other books and records had been entrusted to Mr. Harold Rosenberger. Mr. Rubin had the time-consuming and painstaking task of putting volumes of records and papers in proper order after decedent's death.

Besides the scrap, decedent owned four bank and savings accounts which were closed out by Mr. Rubin, some U. S. Savings Bonds, a cause of action against the Pennsylvania Turnpike Commission and five parcels of real estate. The exact boundaries of the scrap yard were in doubt and a survey and plan were required. The other properties were occupied by tenants and Mr. Rubin collected rents; secured necessary repairs, heard tenants' complaints and generally acted as manager. Mr. Rubin kept all of the tenants until the close of his management of the property. One of the tenants on the scrapyard premises objected to the estate's interpretation of his lease and this matter required negotiation.

The cause of action against the Pennsylvania Turnpike Commission arose out of the commission's condemnation of decedent's land about 1952. The turnpike had condemned a strip through decedent's scrap-

yard and a building located thereon. The condemnation negotiations prior to decedent's death were handled by Joseph Knox Fornance, Esq. A jury of view had awarded $40,800, which was reduced on appeal by the commission to $35,000. A motion for a new trial is now pending. Mr. Rubin consulted with specialists in the condemnation field to determine the best course of action in regard to this matter.

There were also difficulties pertaining to an easement granted by decedent to Philadelphia Electric Company, in regard to burning the scrap, which was a prerequisite to preparing the scrap for sale, and in regard to appraising the peculiar property involved. Mr. Rubin negotiated with several people in regard to selling the real estate.

Mr. Rubin testified that he spent between 1,500 and 2,000 hours in administering the estate. A memorandum prepared from Mr. Rubin's original notes was submitted to the court. This memorandum, noting letters, phone calls, conferences, etc., consumes 66 typewritten pages single-spaced, legal size.

The executor, Mr. Benjamin Cohen, left most of the administration to Mr. Rubin. Mr. Cohen was available only evenings and weekends because of his employment as a tailor by the United States Government Marine Corps.

Counsel fees allowed from an estate must be manifestly just and moderate.

" 'The things to be taken into consideration in determining the compensation to be recovered by an attorney are the amount and character of the services rendered, the labor, the time, and trouble involved, the character and importance of the litigation, the amount of money or value of the property affected, the professional skill and experience called for, and the standing of the attorney in his profession; to which may be added the general ability of the client to pay and the

pecuniary benefit derived from the services' ": Huffman Estate (No. 3), 349 Pa. 59, p. 64; Crawford's Estate, 307 Pa. 102; Davidson's Estate, 300 Pa. 26.

The disagreement over counsel fees is found in the question concerning the peculiarities of this estate. Did this estate present unusual difficulties or greater responsibilities which justify the fee demanded?

To begin with, this estate is clearly not a "Minimum Fee" estate as generally envisioned by the Minimum Fee Schedule. Therefore, such schedule is of very little assistance to the court.

After considering all of the testimony and the record papers, this case presents a picture of an eager young attorney recently admitted to the bar who became counsel for an individual executor in a large estate, anxious to do a thorough and competent job. This eagerness no doubt accounts for the great number of hours spent by Mr. Rubin in this matter. A more experienced attorney could have accomplished a similar result in much less time. The hours spent by Mr. Rubin therefore have not overimpressed the court on setting the fee but the court commends Mr. Rubin for his diligence and industry. The court finds that Mr. Rubin did a thorough and competent job.

The expert testimony took a wide range. Joseph T. Coghlan, Jr., Esq., a member of the Philadelphia Bar since 1932, testified on behalf of Mr. Rubin that 80 percent of his practice involved decedents' estates, that he had reviewed the administration of the present estate, had listened to the testimony in court, and that ordinarily the fee requested would be "a high fee", but that under the circumstances the fee of $28,000 so requested was reasonable. Mr. Coghlan was convinced that this was an extraordinary administration which justified the fee requested.

William F. Fox, Esq., a member of the Montgomery County Bar since 1935, testified on behalf of the es-

tate that he had reviewed the administration of the present estate, that in his opinion the administration was routine with the exception of the construction of the will and that a fee of $10,000 would be reasonable.

Samuel H. High, Esq., a member of the Montgomery County Bar for 29 years, testified that he reviewed the administration of the present estate and that in his opinion a fee of $7,500 would be reasonable.

One further matter should be considered. After the account was filed, but before audit, executor discharged Mr. Rubin as his attorney and retained other counsel. New counsel immediately placed the real estate in the hands of a real estate broker, who, within one month, sold all the real estate as a "package" for $150,000, charging a six percent broker's commission of $9,000. No objection is made to this commission by Yeshiva but it seems to the court to come with little grace for the beneficiary to willingly pay this fee of $9,000, and at the same time take the position that Mr. Rubin should not receive adequate counsel fee.

In summary, the court concludes that the responsibility for appraising and evaluating the scrap required much labor, time and skill and was handled adequately, and that Mr. Rubin's efforts in regard to the real estate, made without the assistance of a real estate broker, must be taken into consideration. See Gelbach's Estate, 24 Dist. R. 1020. I therefore conclude, after a consideration of all factors, that a counsel fee of $16,500 is reasonable and fair in this estate. Since a sum of $7,500 has already been paid, there is due and owing Mr. Rubin a sum of $9,000, and the same is herewith awarded. The objection is therefore sustained and the counsel fee reduced to $16,500.

Should the court award the balance for distribution to the trustee designated by testator?

Yeshiva University has objected to the proposed distribution to Melvin Rubin, Esq., as testamentary trus-

tee, on the grounds that he lacks business experience; that his confirmation as trustee would result in waste and mismanagement and that he conducted himself while acting as counsel for executor so as to personally benefit himself to the detriment of the estate. In addition, Yeshiva University argues that the personal relations between trustee and cestui que trust are so acrimonious and hostile as to make business relations between them impossible.

Mr. Rubin moved to strike these objections and complains that the same law firm on the one hand has prepared and filed the petition for adjudication on behalf of the executor asking that distribution be made to him as the named trustee, yet on the other hand has filed the objections of Yeshiva University opposing such distribution. This is not sufficient reason to strike the objections of Yeshiva University. Executor is a neutral party. The real contesting parties are Yeshiva University and Mr. Rubin.

Mr. Rubin also argues that he, as trustee, is not a party to the present proceeding or even if he is a party, cannot be removed from office until an award of a fund has been made to him; that the procedure followed by Yeshiva University in attempting to remove trustee is improper because its assertions of fact are unsupported by affidavit, are too vague and indefinite and not sufficient as a matter of law to support the relief requested.

There is some question about whether a trustee can be removed before he takes office: Barberger's Appeal, 98 Pa. 29; Taylor Estate, 24 Montg. 123. Barberger's Appeal decided that the orphans' court had no jurisdiction before the issue of letters testamentary either to control the issuing of letters or to compel executor to give bond. Taylor Estate, supra, makes the following statement regarding a petition for removal of a trustee:

"Before he can be removed, he must be in office. And the power of the Court to remove a trustee is derived entirely from statute. . . . Before the Court has jurisdiction over a trustee, it must be shown that he is exercising the office, has the estate in charge, and that for one of the reasons found in the acts of assembly he should be removed from his office and the management of the trust turned over to another. No property of the estate has come into his hands. It cannot be said, therefore, that he is wasting the property, nor that the interests of the estate are jeopardized." 24 Montg. p. 127.

The present case differs from both of the foregoing in that the testamentary trustee in the present case has already voluntarily brought himself before this court in this very proceeding by filing objections, *as trustee*, seeking to surcharge the executor in the amount of $19,750. Thus, the trustee is exercising the office. See Rentschler Estate, 11 D. & C. 2d 357, aff'd 392 Pa. 46, where a testamentary trustee was removed at the audit of executors' account.

A more serious complaint arises, however, by reason of Yeshiva University asserting that Mr. Rubin accepted money improperly from a Mr. Harry Phillips in connection with the sale of the scrap for which he did not account to the estate which, if true, should disqualify Mr. Rubin from serving as trustee. The testimony on this matter is related at some length because of the seriousness of the charge laid at Mr. Rubin's doorstep.

Mr. Rubin testified that the only money he received from Mr. Phillips was in the form of a cashier's check for $25,090 in payment for the scrap materials and a check for payment for telephone and electric bills which were due to the estate.

Mr. Harry Phillips appeared and testified on behalf of the estate that he purchased the scrap from

the estate on or about March 19, 1959; that thereafter he received phone calls from Mr. Rubin requesting funds from him; that Mr. Rubin told him by telephone that if he did not pay Mr. Rubin $2,000, he would have to pay a "heavy rent" and would receive no help in obtaining a burning permit from the township. The witness testified that a day or two after he purchased the scrap he met Mr. Rubin at his home from where they proceeded to a service station and that at the service station, in the men's wash room, he handed Mr. Rubin $700 in cash. He further testified that another $200 in cash was deposited at Myers' Delicatessen on York Road in Hatboro in an envelope for Mr. Rubin at his request.

On cross-examination, Mr. Phillips testified that Mr. Rubin told him he wanted money for furniture and that he had a bid $2,000 higher than Mr. Phillips' bid for the scrap.

Mr. David Myers testified on behalf of the estate that in May of 1959 he was the owner of Myers' Delicatessen on York Road in Hatboro; that Mr. Phillips had left an envelope at his delicatessen on a Friday afternoon with instructions that it be turned over to a certain man; that he could not remember the name of the man who was to receive the envelope; that a man asked for the envelope on Saturday morning, but, because he was in doubt, he told the man to come in with Mr. Phillips. Sometime later, Mr. Phillips came into the delicatessen and reclaimed the envelope.

Mr. Herbert York testified on behalf of the estate that in March of 1959 he was employed by Mr. Phillips as a watchman; that he accompanied Mr. Phillips to the home of Mr. Rubin and later to a service station where he observed Mr. Rubin and Mr. Phillips together in the men's washroom.

Mr. Laverne Long testified that he knew Mr. Phillips ever since childhood and that his reputation for veracity in the community was not good.

Mr. Leo Martin, who sold produce and garden supplies near the scrap yard, testified that he met Mr. Phillips shortly after he had begun operations at the scrap yard and that Mr. Phillips told him Mr. Rubin was "no good" and that he would attempt to have him removed from his position as attorney for the estate and trustee.

Mr. Cohen, executor, testified that on the first Sunday following the purchase of the scrap by Mr. Phillips, he visited Mr. Phillips at the scrap yard and was told about a payment to Mr. Rubin of $700. He further testified that on another occasion after May 22, 1959, Mr. Phillips told him about a $200 payment to Mr. Rubin and about leaving the $200 at Myers' Delicatessen in Hatboro. Mr. Cohen testified that Mr. Phillips had asked the $900 be credited to the rent he owed the estate.

Mr. William W. Kline, a guard at the State Penitentiary, Graterford, and Police Chief of the Borough of Pennsburg, testified that Mr. Phillips had a bad reputation for honesty.

After consultation with Yeshiva, executor terminated the services of Mr. Rubin as counsel, objecting to the manner in which Mr. Rubin was handling the affairs of the estate and because both executor and Yeshiva were of the opinion that Mr. Rubin had breached his fiduciary duty by accepting cash payments totalling $900 from the purchaser of the scrap for which he did not account. It is also the contention of Yeshiva that the relations between Mr. Rubin and Yeshiva are so acrimonious and hostile that confirmation of Mr. Rubin as trustee would render harmonious relations between the parties impossible and would jeopardize the interests of the estate and of the beneficiary.

The court agrees that if Mr. Rubin did in fact accept cash payments from Mr. Phillips for which he did not account there was a breach of fiduciary duty

and Mr. Rubin should not be confirmed as trustee of the estate. Determination of this question of fact depends to a very great extent upon the question of credibility.

Mr. Rubin testified that Mr. Phillips attempted to bribe him to allow an inspection of bids on the scrap metal and to permit Mr. Phillips to make the final bid at a price just slightly above the next highest bid.

Eugene M. Schloss, Jr., Esq., a member of the Philadelphia Bar, testified that he was associated with Mr. Rubin in the practice of law at the time a bribery attempt was made and that he was in Mr. Rubins' office when Mr. Rubin received a telephone call from Mr. Phillips. He testified that he did not hear the voice of the person who telephoned Mr. Rubin but that he heard Mr. Rubin address the caller as Mr. Phillips and heard Mr. Rubin say, "I will not do any such thing", during the course of the conversation. After the telephone conversation, Mr. Rubin told Mr. Schloss that Mr. Phillips once again tried to bribe him by offering him a Chevrolet automobile. It is contended that Mr. Schloss's testimony is hearsay and inadmissible.

This testimony was properly admitted. Where it is established either directly or by circumstantial evidence that a telephone conversation took place between individuals, it is competent for a bystander to relate that part of the conversation which he heard, provided such statements are competent evidence: Ehrenstrom v. Hess, 262 Pa. 104; Takahashi v. Hecht Co., 64 F. 2d 710. See Wigmore on Evidence, §669 fn. 3. That part of the conversation which Mr. Schloss heard and Mr. Rubin's comments after the conversation are admissible evidence and not hearsay in accordance with the *res gestae* rule: Commonwealth v. Friedman, 193 Pa. Superior Ct. 640.

The testimony of C. Edmund Wells, Esq., is not considered by the court because his testimony relates solely

to a collateral matter. See Commonwealth v. Petrillo, 341 Pa. 209, at p. 223.

After considering all of the competent evidence the court finds that Mr. Rubin while acting as counsel for executor, did not conduct himself as to personally benefit himself at the expense of and to the detriment of the estate.

"The removal of a trustee is a drastic action, which should only be taken when the estate is actually endangered and intervention is necessary to save trust property": Mathues' Estate, 322 Pa. 358, 359; and this is particularly true where, as here, the fiduciary is a testamentary trustee who enjoyed the confidence of the settlor of the trust: Crawford's Estate, 340 Pa. 187; Bailey's Estate, 306 Pa. 334; Neafie's Estate, 199 Pa. 307. There must be strong proof of clear necessity for interference to save trust property: Hartman's Estate, 331 Pa. 422. It must be assumed that testator had good reasons for selecting the fiduciary he did: Taylor Estate, 24 Montg. 123.

In the present case there is no necessity to interfere with testator's selection of Mr. Rubin as trustee of his estate. The court finds Mr. Rubin not guilty of the alleged misconduct on the testimony produced by Yeshiva University.

The testimony submitted by Yeshiva is overwhelmed by the following considerations:

(1) The complete denial by the named trustee, a member of the Philadelphia Bar with a good reputation.

(2) This court's own reluctance to ascribe much credibility to the testimony of Mr. Phillips.

(3) The bad reputation of Mr. Phillips for veracity.

(4) The inconsistencies in the testimony of Mr. Phillips.

(5) The attempt of Mr. Phillips to bribe Mr. Rubin.

(6) Statements made by Mr. Phillips to the effect that he would attempt to have Mr. Rubin removed from his position as attorney for the estate and trustee.

On the question of hostile relations, Yeshiva University argues that personal relations between them are so acrimonious and hostile as to make business relations impossible and a change of trustee is required; that the acrimony and hostility are apparent in this very proceeding arising from the objection of Yeshiva to Mr. Rubin's fee, the petition of Yeshiva to remove Mr. Rubin and Mr. Rubin's demand for surcharge of executor.

"While inharmonious relations between trustee and cestui que trust, not altogether the fault of the former, will not generally be considered a sufficient cause for removal, yet where they have reached so acrimonious a condition as to make any personal intercourse impossible and to hinder the proper transaction of business between the parties, a due regard for the interests of the estate and the rights of the cestui que trust may require a change of trustee": Price's Estate, 209 Pa. 210, 212.

Mr. Rubin has manifested no feelings of animosity or ill-will towards the beneficiary or its officers. Certainly, he has never indicated that he in the slightest measure would administer the trust to the prejudice of the beneficiary. The litigation concerning counsel fee is a matter of difference of opinion as demonstrated by the expert testimony and the demand for surcharge of executor is made by the named trustee for the benefit of the estate. The fact that the university does not think a surcharge appropriate is again a matter of opinion. Mere difference of opinion or judgment between trustee and beneficiary are not enough to justify the removal of the former: Price's Estate, supra.

Yeshiva's petition for removal of Mr. Rubin is herewith dismissed.

The attorney general of the Commonwealth filed a petition requesting this court to remove Melvin Rubin, Esq., as trustee, for the following reasons:

"(a) The Trustee is not a member of the Montgomery County Bar Association and he is not subject to the direct supervisory jurisdiction of this Court.

"(b) The Trustee is in no manner associated with the Charitable Beneficiary, Yeshiva University.

"(c) A dispute involving litigation over excessive counsel fee charges has already developed between the Trustee and the Charitable Beneficiary, and it is highly probable that the same may occur in the future once the trust commences to be administered.

"(d) The Charitable Beneficiary is governed by a Board of Trustees which Board could adequately and competently serve as Trustee of the charitable fund without the imposition of any fees whatsoever against the said fund, all to the greater benefit of the charity.

"(e) Melvin Rubin, Esquire, is an individual and in the event of death, disability or removal from the jurisdiction, there would be no continuing Trustee to administer the said trust fund.

"(f) The Board of Trustees of Yeshiva University is a self-perpetuating Board which does away with the problem of lack of a continuing Trustee."

The preliminary objection regarding the untimely nature of the petition is dismissed for the reasons already expressed above in connection with a similar preliminary objection filed to the pleading of Yeshiva University.

Mr. Rubin contends by way of preliminary objections that the attorney general has no standing or authority to petition the court for removal and substitution of the trustee in this estate for the reason that (1) the trust is not for the benefit of residents of Pennsylvania, that (2) the general public has no interest in

the present trust, that (3) only the beneficiary, Yeshiva University, has standing to seek removal and finally that (4) the reasons advanced by the Commonwealth for removal are insufficient as a matter of law.

As to arguments (1), (2) and (3) the short answer thereto can be found in recent pronouncements by our Supreme Court in Pruner Estate, 390 Pa. 529; Garrison Estate, 391 Pa. 234; Voegtly Estate, 396 Pa. 90; Wiegand v. The Barnes Foundation, 374 Pa. 149, and Commonwealth v. The Barnes Foundation, 398 Pa. 458, holding that the attorney general, as parens patriae, is an indispensable party in every proceeding which affects a charitable trust, whether the proceeding be one of invalidation, termination, administration or enforcement of such trust.

In the present case, testator was domiciled in Pennsylvania, the corpus has its situs here, and trustee designated by testator is a resident of Philadelphia. In these circumstances the attorney general of the domiciliary state is the logical and particularly suitable party to protect the rights of the public when all such rights are to be determined in accordance with the law of the domiciliary state. The fact that the charitable beneficiary is a nonresident is not controlling. Cf. Garrison Estate, supra.

We come then to the issue: Does the attorney general's petition state good cause for removal of Mr. Rubin as trustee. Sections 921 and 331 of the Fiduciaries Act of April 18, 1949, P. L. 512, set forth the grounds for the removal of a trustee.

The allegation that Mr. Rubin is not a member of the Montgomery County Bar is no reason for removal (McInnes' Estate, 27 Pa. C. C. 574), nor is the fact that the trustee is in no manner associated with the charitable beneficiary, Yeshiva University.

The dispute now in litigation concerning counsel fees due counsel for executor and the possibility of

future disputes concerning commissions due trustee are not sufficient grounds for removal.

The fact that other potential trustees are in existence is no ground for removal of the named trustee. It is not for this court to say that testator could have named a better trustee.

"A testator has, as a property right, the privilege and power to place the management of his estate in a selected person as a condition of his bounty": Mathues' Estate, 322 Pa. 358, at page 359.

"Before a trustee can be removed, the statutory reasons for removal must clearly appear": Parson's Estate, 82 Pa. 465; Taylor Estate, supra.

"The removal of a trustee is a drastic action, which should only be taken when the estate is actually endangered and intervention is necessary to save trust property": Mathues' Estate, 322 Pa. 358, at page 359.

In summary the reasons urged by the attorney general for removal of the named trustee are insufficient as a matter of law. Therefore, the petition of the attorney general is dismissed.

Mr. Rubin, the named trustee, has objected to the supplement to the account of executor on the ground that the executor improperly sold for $150,000, less broker's commission, the five parcels of real estate owned by the estate. Mr. Rubin asserts that this occasioned a loss to the estate of $19,750 for which sum the executor should be surcharged. Mr. Rubin alleges also that the executor paid excessive brokers' commissions in the sum of $9,000, for which sum executor should now be surcharged.

All five pieces of real estate were sold in one "package" and there is no reason why executor should allocate portions of the gross sales price to each of the five parcels.

A fiduciary charged with a duty to sell land can properly employ a broker, and if a sale is effected as

a result of the production of a purchaser by the broker, the fiduciary can pay him compensation out of the estate: Burke Appeal, 378 Pa. 616.

The only basis for surcharge of executor is that executor sold the five parcels of real estate for $19,750 less than the appraised value of the real estate. The evidence in support of the surcharge consists of the inventory and appraisement stating the aggregate value of the five parcels to be $169,750, appraisals made by various real estate brokers and used as a basis for the inventory and appraisement, the testimony of Mr. Rubin that he had received offers on all of the real estate parcels except on the premises situate 308 Rosemary Avenue, Ambler, and the testimony of Mr. Rubin that he was convinced a better price was obtainable. The appraisal by the Commonwealth for inheritance tax purposes was $170,350. Mr. Cohen, executor, executed the inventory and appraisement and the death tax forms in which he stated the value of the real estate to be $169,750.

The evidence offered by executor consists of testimony of Mr. Joseph Lehman, the broker who finally negotiated the sale, that certain appraisals on some of the properties were too high, the testimony of Mr. Harry D. Livingston, a trust investment officer, to the effect that real estate is seldom sold at exactly its appraised figure and that the sale prices can easily vary 10 to 15 percent.

It should also be noted that the appraisals made by the various real estate brokers vary as much as $21,500 in one case on one property. As noted above, at least one property, the scrap yard property, was a very peculiar piece of ground and in fact executor and Mr. Rubin had difficulty obtaining two appraisals by two qualified appraisers that were substantially similar.

The court cannot, on the basis of this evidence, find that the price received by executor was inadequate. There is no doubt as to the right of the trustee to challenge the adequacy of the price (Restatement of Trusts, §177), or the propriety of surcharge where an inadequate price is obtained: Dundas Appeal, 64 Pa. 325. However, there will be no surcharge unless there is negligence or default: Dundas Appeal, supra. A careful review of the evidence in the record does not justify such surcharge and these objections are herewith dismissed. . . .

And now, May 4, 1961, this adjudication is confirmed nisi.