## Commonwealth, Appellant, *v.* The Barnes Foundation.

Argued January 5, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Lois G. Forer*, Deputy Attorney General, with her *Anne X. Alpern*, Attorney General, for appellant.

*Victor J. Roberts*, with him *Benjamin O. Frick*, and *High, Swartz, Childs & Roberts*, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, March 22, 1960:

The Barnes Foundation in Montgomery County owns and possesses one of the extremely valuable art collections in the country. The paintings, numbering more than a thousand, include works by Renoir, Cezanne, Manet, Degas, Seurat, Rousseau, Picasso, Matisse, Soutine, Modigliani, Pascin, Demuth, Glackens, Rouault and Afro. Among the old masters are works by Giorgione, Titian, Tintoretto, Paolo Veronese, El Greco, Claude le Lorrain, Chardin, Daumier, Delacroix, Courbet and Corot. The pecuniary value of this treasure ranges reputedly from twenty-five to one hundred million dollars.

Although the Barnes Foundation has been judicially recognized as an institution of public charity and, therefore, enjoys exemption from taxation, the public as such has been denied access to the gallery housing the canvases and other works of art. Because of that fact, the Attorney General of Pennsylvania filed on April 17, 1958, in the Court of Common Pleas of Montgomery County, a petition for citation calling upon the Barnes Foundation and its trustees to show cause why they should not unsheathe the canvases to the public in accordance with the terms of the indenture and agreement entered into between Albert C. Barnes, the donor, and the Barnes Foundation, the donee. The respondents filed preliminary objections averring that the petition failed to state a "cognizable cause of action," and that it did not specify "in what manner or to what extent or by what improper acts of the respondents any members of the public have been denied access."

The then Attorney General Thomas D. McBride filed a motion for discovery explaining that he did not include the information adverted to by the defendants because that information was in the exclusive posses-

sion of the defendants and he accordingly requested the court to direct the defendants to produce the books and records of the Foundation with the data needed to pursue the Commonwealth-initiated proceedings. On June 23, 1958, Judge TAXIS of the Court of Common Pleas of Montgomery County signed an order allowing discovery by inspection. The defendants followed with a motion to vacate the order. The court allowed this motion but, on January 21, 1959, overruled the preliminary objections and required the respondents to file responsive answer in twenty days. The respondents petitioned for a reargument which was allowed and then, finally, on May 7, 1959, the court entered its definitive order rescinding its opinion of January 21, 1959, and sustaining the demurrer of the respondents. The Commonwealth, through now Attorney General Anne X. Alpern, who had succeeded Thomas D. McBride, appealed.

It is necessary here, with a few rapid strokes, to depict the background of this litigation. In 1922, Dr. Albert C. Barnes, a physician who had amassed a considerable fortune as the result of his compounding a chemical formula (argerol) which he kept secret and exploited by commercial manufacture and sale to the public, decided to offer to mankind a good portion of his riches, specifically his unique art collection and an arboretum as an "experiment to determine how much practical good to the public of all classes and stations of life, may be accomplished by means of the plans and principles learned by the Donor from a life-long study of the science of psychology as applied to education and aesthetics."

It was his expressed desire that, after the death of himself and his wife "the plain people, that is, men and women who gain their livelihood by daily toil in shops, factories, schools, stores and similar places, shall have free access to the art gallery and the arboretum upon

those days when the gallery and arboretum are to be open to the public . . ."

A corporation was duly organized under the laws of Pennsylvania to receive and administer the estate, works and property to be conveyed to it by Dr. Barnes. This corporation became known as The Barnes Foundation. On December 6, 1922, Dr. Barnes, by deed of trust, transferred to the Barnes Foundation (hereinafter to be referred to as the Foundation) his art collection, house, property and the grounds known as the Lapsley Arboretum in Montgomery County together with certain sums of money represented in 900 shares of the common capital stock of A. C. Barnes Company, a corporation of Pennsylvania. By medium of an indenture, which eventually embraced 39 paragraphs, a code of procedure was formulated for the maintenance and operation of the Barnes trust.

In October, 1929, the Foundation purchased for $50,000 a property in Philadelphia. When city and school taxes were levied on this property, the Foundation claimed exemption on the basis that the entire Foundation was a public charity. The resulting litigation reached this Court which, through Justice KEPHART, declared: "We have carefully examined the record and find that there was evidence to support the findings that appellee [the Foundation], an educational institution, was a purely public charity. The foundation had its origin in a charitable impulse of its founder. It was the result of the generosity of Dr. Albert C. Barnes: all its real and personal property, including its endowment, was donated by him." (*Barnes Foundation v. Keely*, 314 Pa. 112, 116)

Although the Foundation thus assumed indisputable status as tax-exempt public charity, its officers and trustees have consistently refused to the public admission to its art gallery. A painting has no value except the pleasure it imparts to the person who views it. A

work of art entombed beyond every conceivable hope of exhumation would be as valueless as one completely consumed by fire. Thus, if the paintings here involved may not be seen, they may as well not exist. The respondents argue that the paintings may be seen, but only privately. However, that is not what Dr. Barnes contemplated and it certainly is not what the tax authorities intended. If the Barnes art gallery is to be open only to a selected restricted few, it is not a public institution, and if it is not a public institution, the Foundation is not entitled to tax exemption as a public charity. This proposition is incontestable.

In the case of *Delaware County Institute of Science v. Delaware County,* 94 Pa. 163, the Institute sought exemption from taxation on the basis that its object was to "promote the diffusion of general and scientific knowledge among its members and the community at large; and the establishment and maintenance of a library, an historical record and a museum." The evidence revealed that the community at large was not allowed to use the library or to make use of its facilities, these facilities being restricted to the Institute's members. The Court of Common Pleas of Delaware County held: "The test of all public charities is their extensiveness. If the general benefits of a charity are subject to private preferences or conditions by which a large proportion of the general public will probably be excluded, it is a private charity, and therefore, not within the protection of the Act of Assembly [on tax exemption]." This Court affirmed the denial of tax exemption, declaring per curiam: "The plaintiff in error, so far from being a purely public charity, is not a public charity at all. It is a private corporation for the benefit of its members, as much so as any other beneficial or literary society. It might permit others than members to use the library, but nobody could call it to account for refusing such permission. . . ." This Court also ap-

proved of the statement in the case that: " 'An essential element of a public charity is the right of public visitation for the correction of abuses and the enforcement of the founder's will . . .' "

In the case at bar, the Attorney General, as *parens patriae*, seeks to ascertain why the Foundation as a public charity has closed the doors of its art gallery to the public. The respondents argue that the Foundation never intended its art gallery to be a public gallery, that the principal intendment of the Trust Indenture was to establish an educational institution, and that the art gallery is merely incidental to teaching. The Court of Montgomery County stated that "a careful reading of the indenture compels the conclusion that the Settlor was primarily concerned with establishing an educational institution." But there is nothing in the indenture which rivet-proofs that assertion. Dr. Barnes was, of course, concerned with education. Even enjoying the contents of an art gallery is a matter of education,[1] but Dr. Barnes did not declare his trust estate to be exclusively a school.

In Paragraph 34 of the indenture, Dr. Barnes specifically stated that "The Barnes Foundation is to be maintained perpetually for education in the appreciation of the fine arts and not as a school for instruction in painting, drawing, sculptoring or any other branch of art or craftmanship."

Although the Foundation has been in court at least three times,[2] it is not yet too clear just what constitutes the curriculum of the educational courses in the Foun-

---

[1] The University of Pennsylvania which, of course, is strictly an educational institution, maintains a museum in connection with its educational courses, but the museum is open to the public every day from Tuesday through Saturday from 10 a.m. to 5 p.m., and on Sundays from 1 to 5 p.m.

[2] *Barnes Foundation v. Keely*, 314 Pa. 112; *Wiegand v. Barnes Foundation*, 374 Pa. 149, and the present litigation.

dation. At the oral argument, counsel for the Foundation did not know or would not say how many pupils were enrolled at the Foundation. He contented himself with saying merely that the school was "full." The Attorney General of this Commonwealth not only has the authority but the duty to ascertain what are the facts surrounding the school in the Foundation to determine if it should be insulated from the shock of taxation which hits all other citizens and enterprises in the land. Every dollar a public institution saves in tax levy becomes an extra stone in the heavy sack the Commonwealth piles on every taxpayer's back.

The indenture states that the Foundation has for its corporate purpose the "promotion of the advancement of education and the appreciation of the fine arts." If, as the respondents contend, the Foundation was dedicated to education alone, the corporate purpose would probably have been expressed as "the promotion of the advancement of education *in* the appreciation of the fine arts." However, the connection between the two phrases is a conjunction and not a preposition. Thus, the Donor intended as the corporate purpose of the Foundation two objectives: education *and* appreciation of fine arts.

A reading of the indenture will disclose that it contains many references to art gallery and works of art without mentioning education or school. For instance, we find: In Paragraph 7: "During the life of Donor he shall be director of the Art Gallery and in charge of pictures, but without salary." In Paragraph 12. "Donor is now making plans and executing contracts for the construction of a gallery and adjacent buildings . . ." In Paragraph 13: "No part or portion of the art gallery nor of the administration buildings adjacent thereto to be occupied by Donor . . . shall be occupied as for a residence . . ." In Paragraph 23: "In connection with the Art Gallery *and* the art education-

al work of Donee . . ." (Emphasis supplied) It will be noted here that the educational work is regarded as something additional to the duties exacted of the art director.

In paragraph 30, referring to the hours in the weekdays when the gallery is to be open to the public, we find: "This restriction shall apply to the gallery and building connected therewith only, and not to the Arboretum." It is true that this is a provision applying to the use of the gallery after the death of the donor and his wife, but it demonstrates that, in the entire trust administration, the art gallery is to be a thing apart.

The respondents argue that they are not required to give the public any access to the art gallery. This statement is flatly made in their brief, as follows: "It is the appellee's position that by the terms of the trust indenture the trustees of the Barnes Foundation are given express authority (paragraph 29 of the indenture, R 26a-27a) to deny to the public access to the art gallery."

The brief states further that the students of the Foundation should have the art gallery at their disposal, "unhampered by interference from the public." This is an anomalous observation to make concerning a public institution exempt from public taxation.

The first sentence of Paragraph 29 of the indenture states specifically: "During the life of Donor and his said wife the art gallery of Donee shall only be open to the public on not more than two days in each week, except during July, August and September of each year, and only upon cards of admission issued by or under the direction of the Board of Trustees of Donee." There is nothing in this sentence or in the sentences which follow in Paragraph 29 which empower the board of trustees to exclude the public entirely. The mandate is that the gallery shall be open to the public on

not more than two days of each week. Conceivably, under this provision, the visiting, for an explained and justifiable reason, could be limited to but one day or only part of a day a week, but the public cannot be forced to face sealed doors all the time. To deny the people any opportunity to look into the gallery is to make a mockery of the entire indenture with its emphasis on democratic principles and its absolute prohibition of special privilege.

Paragraph 33 specifically declares: "The purpose of this gift is democratic and educational in the true meaning of those words and *special privileges are forbidden.*" (Emphasis supplied.)

And now we come to the crux of the litigation. It cannot be questioned that Attorney General Alpern, by virtue of the powers of her office, is authorized to inquire into the status, activities and functioning of public charities. This authority was recognized at common law: "It is the duty of the King as *parens patriae* to protect property devoted to charitable uses; and that duty is executed by the officer who represents the Crown for all forensic purposes. On this foundation rests the right of the Attorney General in such cases to obtain by information the interposition of a court of equity." (*Attorney General v. Brown,* 1 Swanst 291).

This Court has affirmed the common law in holding that where litigation involves charitable trusts, the Attorney General is obliged to participate as a necessary party. (*Garrison Estate,* 391 Pa. 234). It would be an inadequate form of government which would allow organizations to declare themselves charitable trusts without requiring them to submit to supervision and inspection. Without such supervision and control, trustees of alleged public charities could engage in business for profit. It is because of the temptation which such lack of supervision would offer, that a Congressional committee observed: "Foundations should

not only operate in a goldfish bowl, they should operate with glass pockets." (H.R. Report 2514, 82d Congress.)

Thus, in carrying out the prescribed duties of the Attorney General's office, the petition for citation came into being and directly charged that: "In violation of the Indenture referred to in paragraph 2 hereof the defendants have failed to operate and maintain an art gallery for the exhibition of the works of art and access to the buildings of The Barnes Foundation housing the art collection is denied to the public."

The lower court held that the petition did not allege a cause of action. But what more formidable cause of action could exist than the assertion that the trustees of a charitable trust are failing to carry out the mandates of the indenture under which they operate? The respondents, by demurrer, concede the truth of the averments in the petition. By this admission they admit a violation of the indenture because no matter how the indenture is interpreted, it is indisputably apparent that in some form or another, and at some time or another, the public is to be admitted to the Art Gallery. The petition unequivocally declares that access to the Gallery by the public is denied. This statement is absolute and carries no limitations: The defendants have sealed off the Art Gallery to the public. In doing this, they indifferently or arbitrarily choose to close their eyes to the edict of paragraph 29. They may argue that there must be limitations in the public's frequenting of the gallery, but they cannot successfully argue that the public can be shut out as if it were a contagion.

In *Barnes Foundation v. Keely*, 314 Pa. 112, 117, this Court specifically said: "Its [Foundation's] property located in Montgomery County is open to the public which is admitted thereto in accordance with the provisions of the by-laws, rules and regulations of the foundation." The lower court seeks to use the *Keely*

case in supporting its decision dismissing the Commonwealth's petition by quoting from that decision as follows: " '. . . the unrestricted admission of the public would be as detrimental to the work of the Barnes Foundation as it would be to the work carried on in the laboratories and clinics of the University of Pennsylvania.' "

But this limitation does not and cannot wipe out this Court's statement that the Foundation's property "is open to the public." Naturally, the general public cannot use the gallery at will. The general public cannot even use a public library at will. Orderliness requires that there be hours of opening and closing of libraries, that hours or days be set aside for rest of personnel, for taking inventory, for cleaning and repairing the property and facilities. But no library would be considered public if the public could be admitted only upon the caprice, whim, and arbitrary will of its administrators.

Similarly the trustees of the Barnes Foundation may not exclude the public from the Art Gallery without offering explanation as to why it ignores the expressed intention of Dr. Barnes that the Gallery shall, within certain restrictions, be open to the public. The defendants will be required to answer the petition for citation and suitable discovery shall be allowed the Attorney General to the end that the rights of the public in the indenture, and in accordance with public policy, may be protected and assured.

The order of the court below is reversed and the petition is reinstated with directions that the defendants file an answer within 20 days; the costs to abide the event.