MILTON HERSHEY SCHOOL and
Hershey Trust Company, Trustee
of Milton Hershey School Trust.

Appeal of: Milton Hershey School
Alumni Association.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 2004.
Decided Jan. 31, 2005.

Victor P. Stabile, Harrisburg, John W. Schmehl, Philadelphia, and F. Frederic Fouad, New York, for appellant.

Barbara W. Mather, Philadelphia, for appellees. John G. Knorr, III, and Heather J. Vance–Rittman, Harrisburg, for appellee, Office of Attorney General.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

## I.

The Milton Hershey School Alumni Association (Association) appeals an order of the Court of Common Pleas of Dauphin County (trial court) dismissing for lack of standing the Association's challenge to the rescission of an agreement between the Office of Attorney General (OAG), the Milton Hershey School (School) and the Hershey Trust Company (Trust Company) that prohibited conflicts of interests and other actions by the trust managers that were deemed inimical to the interests of the orphan beneficiaries.

## A.

Because standing is largely determined by the type of interest a party is asserting, it is necessary to determine the sufficiency of the interest and to set forth in some detail what the object of that interest is— in this case, the School and the Trust Company. In 1909, Milton and Catherine Hershey (the Hersheys) established the Milton Hershey School, a charitable institution funded by the Milton Hershey School Trust (Trust). The School provides residential care for dependent and at-risk children, or "orphan" children as the term was then used. The Hersheys originally

contributed 12,000 acres of land to the corpus of the trust and bequeathed virtually their entire fortune for the purpose of saving orphan children.

The deed of trust is the original agreement between the Hersheys, the Hershey Trust Company as Trustee of the Trust, and the Managers of the Trust (originally, Milton Hershey, W.H. Lebkichner and John E. Snyder). The original deed was amended in 1976 and provides that the School is to be administered by the Trust Company and the Board of Managers. It states that the School was organized to "receive and admit to the School as many poor, healthy children as may from time to time be determined by the Managers, to the extent, capacity, and income of the School will provide for and shall be adequate to maintain." (Reproduced Record at 23a).

As directed by the deed of trust, the members of the School's Board of Managers are also members of the Board of Directors of the Trust Company. The deed endows the Board of Managers and the Trust Company with decision-making responsibility for all aspects of running the School and for management and administration of Trust assets. Together, they are charged with making all decisions about the use of trust funds, land development and sales, admissions and education under the standards set forth in the deed of trust. For instance, the sale of land owned by the Trust is administered as follows: "[T]he Trustee may from time to time, but only with the approval of the Managers, sell and convey in fee simple any part or portion of the lands conveyed by this deed, or which may have been brought or otherwise acquired, which in the judgment of the Managers is not necessary to be kept for the purposes of the School[.]" (*Id.* at 21a).

The deed of trust provides that the beneficiaries of the Trust are the orphan children attending the School. Children cared for by the Trust within the orphan parameters established by the Hersheys have a high degree of social and financial need and would otherwise require residential care in other facilities, such as foster care. Once enrolled, these children have all of their educational, physical, spiritual and other needs met by the Trust in a setting commonly referred to as the children's home. Those within the care of the Trust establish familial bonds with each other, viewing the School as a home and viewing other children at the School as a type of surrogate family. These bonds cross generational lines, and adults who had been within the care of the School have shown a devotion and commitment to the welfare of children later entering the School's care.

At the direction of Milton Hershey, the Association was created 74 years ago and is comprised entirely of orphan graduates of the School. It is a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), incorporated under the laws of Pennsylvania. One of its functions is to directly serve orphan beneficiaries and to continue the bonds that form in orphanhood while under the care of the School. Pursuant to the Association's Articles of Incorporation, its purpose includes:

the promoting in every proper way of the interests of Milton Hershey School, including ... the establishment and maintenance of supplemental educational programs and activities for students ... that encourage habits of thrift, industry, leadership, scholarly achievement, and other attributes of good citizenship; and to foster among its graduates an attachment to their Alma Mater.

(Brief for Appellant, Attachment 4). From its office on the School's property (owned by the Trust), the Association provides student-related functions and young graduate assistance programs, including programs directed at mentoring, job shadowing, transitioning, general graduate assistance and graduate crisis services. Orphan children that graduate from the School often become members of the Association.

The Association is not a division of the School or of the Trust Company. It was not named in the deed of trust and is not an intended beneficiary of the Trust. As the deed states, "[a]ll children shall leave the institution and cease to be the recipients of its benefits upon the completion of the full course of secondary education being offered at the School." (Reproduced Record at 25a). The Managers of the Trust may, in their discretion, contribute to the higher education of a graduate of the School, in which case graduates would continue to be beneficiaries of the Trust, but generally, once orphans graduate from the School, they are no longer Trust beneficiaries.

Though the Association is not a division of the School, a division of the Trust, or a beneficiary of the Trust, it has participated in many efforts aimed at protecting the charitable intent of the Trust, i.e., to assure that Trust assets are used to promote the child-saving mission of the Hersheys. It has made efforts in the past to prevent Trust resources from being diverted to non-child purposes and has lobbied the OAG and the Trust Company for assistance in this regard.

Another participant in the affairs of the Trust is the OAG. The OAG is charged with enforcing the duties of charitable trustees and protecting the public. In addition to overseeing the Trust administration, the OAG also holds the position that in exercising that duty, it is seeking to protect the community and general public in addition to the orphan beneficiaries designated as such under the terms of the deed of trust.

From 1970 to 2003, Trust assets grew from $200 million to $5.5 billion (at the time this action was filed with the trial court).[1] It is currently the largest residential childcare charity in the world, dwarfing any comparable facility in asset size. Other entities owned by, controlled by or affiliated with the Trust, such as Hershey Entertainment & Resort Company (HERCO) and the Hershey Medical Center (HMC), also enjoyed tremendous growth during this period.

### B.

While Trust assets grew during this period, the number of children served by the Trust decreased, as did the amount of land appropriated to house the orphaned children (from approximately 10,000 acres to 2,000 acres). To illustrate, some of the land formerly designated for the School use was closed, sold, abandoned or transferred to HERCO, thereby reducing the amount of homes that could house roughly 310 orphans. Another example dates back to 1963, where the OAG and the Trust Company successfully sought removal of 500 acres of land and $50 million in cash from the Trust to build HMC for Penn State University.

Beginning in 1990, the Association began observing what it believed were Trust activities that diverted from the Trust's charitable intent to help orphan children.

1. The Association asserts in its brief that the total could be up to $6.3 billion. For our purposes, we will use the $5.5 billion figure.

As alleged in its petition before the trial court, the Association noticed that School enrollment policies were altered to disfavor or turn away children requiring year-round residential care. In addition, it observed that education, housing and other policies were similarly altered to reflect the differing needs of the enrolled children who increasingly did not require substantially year-round residential care. It also observed that the childcare facilities at the School reached crisis levels in 2001 because of overcrowding, safety concerns and incidents of physical or sexual abuse resulting in a one-year moratorium on enrollment.

The Association became actively involved in efforts to quell what it believed were gross deviations from the charitable intent of the Trust. For instance, the Association reacted to an attempt by the Trust to end entirely the vocational education program mandated by the deed of trust, a program that targets non-college bound students. The Association's efforts resulted in an agreement signed by the OAG and the Trust compelling the Trust to preserve some form of vocational education at the School. The Association also participated as *amicus curiae* in a proceeding initiated by the Trust Company to create the Catherine Hershey Institute of Learning and Development (CHILD) and to divert land to public use that was ultimately rejected by the trial court because it found that CHILD would have violated the Trust's charitable intent.

With the Association's concerns elevating, it alerted the OAG to what the Association believed were serious improprieties associated with the administration of the Trust. The Association alleged that conflicts of interest among the Trust Managers mired their ability to properly administer the Trust to carry out its charitable intent of saving orphan children. It also alleged that there were improper enrollment policies, improper and unsafe residential policies, and improper utilization of Trust assets to serve only orphan children and as many of them as possible. The Association believed that these actions taken as a whole constituted a perversion of the Trust's charitable intent.

Responding to the concerns raised by the Association, the OAG initiated and conducted an exhaustive 12–month investigation into the administration of the Trust.[2] On December 5, 2001, the OAG determined that the Trust Company was diverting from the Trust's charitable intent and called for broad reforms. The OAG made clear that conflicts of interest burdened the Trust Company's decisions and emphasized that personnel changes would be inadequate to address the failures of the Trust, requiring instead structural reforms to obtain lasting improvements to Trust administration. The OAG threatened legal action if necessary to obtain the reforms. As a result, the parties (the OAG, the School and the Trust Company) participated in negotiations. The Association participated in an advisory role and contributed millions of dollars to the process. Though it was not a party to the ultimate agreement, the Association acted to protect its own central purpose of preserving bonds formed in orphanhood and furthering the child-saving mission of the Trust.

On July 31, 2002, the parties reached an agreement (July 2002 Reform Agreement) outlining the reforms that the parties negotiated. The Reform Agreement pur-

---

**2.** The Association alleges that the OAG initially resisted conducting an investigation and only agreed to proceed if the Association committed more resources to the investigation. The Association did so.

ported to (1) end all conflicts of interests; [3] (2) ensure the admission of needy children; [4] (3) mandate a foster care program; [5] (4) restrict land transfers and land uses that focused on anything but childcare; [6] (5) reform academic standards for admissions and expulsions; [7] and (6) require biannual status reports to the OAG. [8]

## C.

After the Reform Agreement was executed, the highly publicized litigation over the controversial sale of a controlling interest in Hershey Foods Corporation (HFC) took place. *See In re Milton Hershey School Trust,* 807 A.2d 324 (Pa. Cmwlth.2002). Though, ultimately, there was no sale of HFC, there was a significant reorganization of leadership within the Trust Managers shortly after the attempted sale. As a result of the reorganization of leadership within the Trust Company and the Board of Managers of the School, the OAG, the School and the Trust Company determined that the Reform Agreement should be modified.

On June 27, 2003, the OAG, the School and the Trust executed an agreement (June 2003 Agreement) modifying the July 2002 Reform Agreement. The background statement included within that agreement indicated that because personnel changes in the Trust Company resulting from the attempted sale of HFC obviated the need for the reforms as they were presented in the original July 2002 Reform Agreement, the parties needed to modify that agreement. By comparison, the June 2003 Agreement (1) modified the provisions relating to conflicts of interest; (2) deleted the income and poverty level guidelines set forth in the July 2002 Agreement aimed at assuring the admission of truly needy children; (3) deleted the foster care program; (4) modified the restriction on land transfers to "sales" and exempting the notice requirement for the sale of land that is already commercially used; (5) modified the academic standards; and (6) changed the status report requirement from biannual, face-to-face meetings to annual written reports.

On September 4, 2003, the Association filed the petition for rule to show cause at issue in this case, seeking rescission of the June 2003 Agreement, reinstatement of the July 2002 Reform Agreement, appointment of a guardian, and appointment of a trustee *ad litem.* The School and the

3. This provision sought to prohibit members of the Trust from serving on the boards of HERCO, HFC or HMS to ensure that the child-saving mission was the chief concern among Trust administrators.

4. This provision responded to the School's trend to admit children whose true social and financial need were lacking. It tied admissions to federal poverty levels to assure that truly needy children were admitted to the School.

5. This provision purported to establish a foster care pilot admission program in Dauphin, Lancaster and Lebanon Counties to seek out children at risk of foster care.

6. In an effort to prevent the diversion of land for non-childcare uses, this provision prohibited the sale or transfer of land without giving

90–day notice to the OAG before a sale of the land, lease of the land, grant of an easement or grant of a right-of-way.

7. This provision would work to avoid disqualifying applicants for lacking scholastic potential and to avoid expelling students for academic reasons unless certain assistance programs were exhausted and used for at least one year.

8. This provision required the School to personally meet with the OAG to discuss progress and to report on major developments with the School. It also assured that the OAG would actively monitor the performance of the School.

Trust Company filed preliminary objections to the petition, alleging that the Association lacked standing to challenge the rescission of the July 2002 Agreement.

The trial court granted the preliminary objections of the School and the Trust. In finding that the Association lacked standing, the trial court rejected the Association's contention that it was bringing suit on behalf of current and potential students because the Association's composition was limited to past members of the School. It also rejected the Association's contention that it was the only party that could protect current and potential students because it argued that the OAG's interest in the Trust was to benefit the public at large, not just the students at the School. Noting that the Association was not part of the original deed of trust, was not a party to any of the agreements, and was merely an advisor during the negotiations that led to the July 2002 Reform Agreement, the trial court refused to confer standing upon the Association because there was no evidence of a complete perversion of the charitable purpose of the Trust and no evidence that the OAG would fail in its purpose of supervising the Trust.

The Association has appealed that determination to this Court. The sole issue on appeal is whether the Association has standing to bring an action to rescind the July 2003 Agreement and reinstate the June 2002 Reform Agreement.

9. This is also commonly known as the Statute of Elizabeth.

10. *Generally* JAMES C. BAUGHMAN, TRUSTEES, TRUSTEESHIP, AND THE PUBLIC GOOD: ISSUES OF ACCOUNTABILITY FOR HOSPITALS, MUSEUMS, UNIVERSITIES, AND LIBRARIES 4 (1987); Maitland, *The Origin of Uses*, 8 HARV. L. REV. 127 (1894).

11. Initially, the Supreme Court of the United States held that charitable trusts were not

## II.

Now that we have the factual background that led to the dispute, it is also necessary to describe the legal terrain on which the issue of standing will be resolved. This involves a discussion of the law of trusts in general and the law of charitable trusts in particular followed by a discussion on the concept of standing.

### A.

■ Generally, a trust is a legal instrument created by one person or entity (the "settlor") purporting to transfer property (the "trust res" or "trust property") to another person or entity (the "trustee") to hold in trust for the benefit of another (the "beneficiary"). *See generally Buchanan v. Brentwood Federal Savings & Loan Association*, 457 Pa. 135, 320 A.2d 117 (1974). The ability to convey property to another to hold in trust has been in existence since the enactment of the Statute of Uses in mid–14th Century England and the enactment of the Statute of Charitable Uses in 1601,[9] both allowing for the transfer of real property to hold as a "use" for the benefit of another.[10] The former commonly dealt with the transfer of real property among private citizens, while the latter, as the name suggests, dealt with the transfer of real property for the benefit of the people. These statutes served as the foundation for modern American trust law and have long been recognized and applied in some form as the law of every state, including Pennsylvania.[11] *See, e.g., Marshall v.*

enforceable in the United States. *Philadelphia Baptist Association v. Hart's Executors*, 17 U.S. (4 Wheat) 1, 4 L.Ed. 499 (1819). In *Vidal v. Girard's Executors*, 43 U.S. (2 How.) 127, 11 L.Ed. 205 (1844), the high court overruled *Hart's Executors* and held that charitable trusts should be recognized as part of the common law. *See also* Jennifer L. Komoroski, Note, *The Hershey Trust's Quest to Diversity: Redefining the State Attorney General's*

*Fisk*, 6 Mass. 24, 31 (1809);[12] *see also, e.g., Sheridan v. Coughlin*, 352 Pa. 226, 42 A.2d 618 (1945) (Statute of Uses is part of Pennsylvania common law); *In re Dulles' Estate*, 218 Pa. 162, 67 A. 49 (1907) (Statute of Charitable Uses is part of Pennsylvania common law).

■ Though the Hershey Trust is a charitable trust, the distinctions between private trusts and charitable trusts are important for comparison and contextual reasons. To create a typical "private" trust,[13] the settlor must have the intent to transfer trust property to the trustee for the benefit of a definite and specific beneficiary or beneficiaries named in the trust. *Buchanan.* The trustee, consequently, is bestowed with legal title to the property in order to manage and transfer the property for the benefit of the beneficiary, while the beneficiary has an equitable interest in the trust property and an actual property interest in the subject matter of the trust. *Jones v. Jones*, 344 Pa. 310, 25 A.2d 327 (1942). Because the role of the trustee involves the management of another's wealth for the benefit of a third party, the trustee has a fiduciary responsibility to act in the best interests of the beneficiaries consistent with the purpose of the trust and the powers granted to the trustee.

■ A charitable trust differs from an ordinary private trust in several important respects, the first being that a private trust can serve any purpose for which the settlor determines, whereas the charitable trust serves some type of recognizable, charitable purpose.[14] Under Section 28 of the Third Restatement of Trusts, the purposes of charitable trusts include, but are not limited to, the following:

(a) the relief of poverty;

(b) the advancement of knowledge or education;

(c) the advancement of religion;

(d) the promotion of health;

(e) governmental or municipal purposes; and

(f) other purposes that are beneficial to the community.

RESTATEMENT (THIRD) TRUSTS § 28, at 9–10. As the General Comment to the Third Restatement of Trusts indicates, this list is not exhaustive:

The common element of charitable purposes is that they are *designed to accomplish objects that are beneficial to the community*—i.e., to the public or indefinite members thereof—without also serving what amount to private trust purposes. . . . As long as the purposes to which the property of the trust is to be devoted are charitable, however,

---

*Role when Charitable Trusts Wish to Diversify*, 54 WM. & MARY L. REV. 1769, 1772–73 (2004) (discussing the historical development of charities in early colonial periods).

12. Chief Justice Parsons of the Massachusetts Supreme Court stated as follows:

[T]he statute of uses being in force in England when our ancestors came here, they brought it with them, as an existing modification of the common law, and it has always been considered a part of our law. . *Marshall*, 6 Mass. at 31 (quoted in CORNELIUS J. MOYNIHAN, INTRODUCTION TO THE LAW OF REAL PROPERTY § 13, at 211–12 (1962)).

13. There are many variations of trusts in Pennsylvania, including active trusts, passive trusts, express or implied trusts, resulting trusts, constructive trusts and oral trusts. We need not delve into an explanation of all the machinations associated with these types of trusts. For purposes of context and comparison, we explain the differences between ordinary private trusts and charitable trusts such as the one involved here.

14. The purpose of any trust, be it private or charitable, must also conform to the law and not be contrary to public interest. *Borden v. Baldwin*, 444 Pa. 577, 281 A.2d 892 (1971); RESTATEMENT (THIRD) TRUSTS § 29, at 53–54.

the motives of the settlor in creating the trust are immaterial. *Id.* § 28, at 10, cmt. a (emphasis added); *In re Tollinger's Estate,* 349 Pa. 393, 37 A.2d 500 (1944).

Second, the beneficiaries of a charitable trust are indefinite in identity and in number, whereas the beneficiaries of a private trust are specific, often few in number, and readily ascertainable. *Provident Trust Company of Philadelphia v. Lukens Steel Company,* 359 Pa. 1, 58 A.2d 23 (1948). Though the beneficiary of a charitable trust is often said to be the public at large, it does not matter that each and every member of the entire public receive a direct benefit from a charitable trust so long as the trust benefits an indefinite class of people to a degree where the performance of the trust substantially benefits the community as a whole. *Tollinger.* For instance, a trust created to establish a shelter for the poor and homeless in a given community does not directly benefit those in that community with a steady job, a steady income, and a home because they would have no need to actually use the shelter. In that situation, however, everyone in that community incidentally benefits from such a trust because it is in the public interest to shelter the poor and the homeless.

## B.

With these principles of trust law in mind, we turn to the difficult concept of standing. In simple terms, "standing to sue" is a legal concept assuring that the interest of the party who is suing is really and concretely at stake to a degree where he or she can properly bring an action before the court. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (stating that the "gist" of standing is whether the party suing alleged such a "personal stake in the outcome of the controversy"); 3 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE, § 14.10, at 387 (2d ed. 1997). Pennsylvania has its own standing jurisprudence, although the doctrine of standing in this Commonwealth is recognized primarily as a doctrine of judicial restraint and not one having any basis in the Pennsylvania Constitution. *Housing Authority of the County of Chester v. Pennsylvania State Civil Service Commission,* 556 Pa. 621, 730 A.2d 935 (1999).

Fundamentally, the standing requirement in Pennsylvania "is to protect against improper plaintiffs." *Application of Biester,* 487 Pa. 438, 442, 409 A.2d 848, 851 (1979). Juxtaposed against the federal standards,[15] the test for standing in Pennsylvania is a flexible rule of law, perhaps

---

**15.** *Lujan v. Defenders of Wildlife* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The federal test is a three part inquiry: (1) Has the party bringing the action alleged an "injury in fact"? (2) Is there a causal connection between the alleged wrongdoing and the injury suffered? (3) Will a favorable ruling by the court likely redress the alleged injury? *Id.* at 560, 112 S.Ct. 2130. The injury must be concrete and particularized to the plaintiff; the causation must be fairly traceable to the defendant before the court, and the relief sought must actually be obtainable from the court. *Id.* Notably, federal standing rules limit access to the courts because Article III of the United States Constitution, U.S. CONST. art. III, limits the judiciary's power to decide only "cases or controversies," and the United States Supreme Court has developed additional "prudential" limitations on the judiciary's ability to decide cases. As a result, a plaintiff must first pass the constitutional standard under *Lujan* and also convince the court that there are no prudential limitations on the court's ability to hear the case. Thus, *Lujan* arguably returns the constitutional component of federal standing jurisprudence to one of true judicial restraint, thereby limiting the types of plaintiffs that the courts would otherwise tolerate. *See* Cass R. Sunstein, *What's Standing After* Lujan? *Of Citizen Suits, "Injuries," and Article III,* 91 MICH. L. REV. 163 (1992).

because the lack of standing in Pennsylvania does not necessarily deprive the court of jurisdiction, whereas a lack of standing in the federal arena is directly correlated to the ability of the court to maintain jurisdiction over the action. *Compare Jones Memorial Baptist Church v. Brackeen,* 416 Pa. 599, 207 A.2d 861 (1965) *with Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Thus, Pennsylvania courts are much more expansive in finding standing than their federal counterparts.

■■■ In *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975), our Supreme Court held that a party has standing to sue if he or she has a "substantial, direct, and immediate interest" in the subject matter of the litigation.[16] *Id.* at 192, 346 A.2d at 281. In *William Penn,* residents, taxpayers and operators of parking lots were affected by a tax ordinance that imposed a tax on patrons of non-residential parking places. The plaintiffs challenged the ordinance and were held to have standing because they were aggrieved by the ordinance. In other words, those challenging the taxing ordinances in that case were parking lot taxpayers and were able to bring their action for that reason because they showed a substantial, direct and immediate interest in the imposition of the tax.

Guided by much of our Supreme Court's discussion in *William Penn,* cases that followed elaborated on the substantial-direct-immediate test. The elements have been defined as follows:

A "substantial" interest is an interest in the outcome of the litigation which sur-

passes the common interest of all citizens in procuring obedience to the law.... A "direct" interest requires a showing that the matter complained of caused harm to the party's interest.... An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, ... and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.

*South Whitehall Township Police Service v. South Whitehall Township,* 521 Pa. 82, 86–87, 555 A.2d 793, 795 (1989) (internal citations omitted).

Although the substantial-direct-immediate test is the general rule for determining the standing of a party before the court, there have been a number of cases following *William Penn* that have granted standing to parties who otherwise failed to meet this test. These so-called "taxpayer standing" cases are best described as relaxations of the general standing rule where the party asserting the action can show that (1) government action will otherwise go unchallenged unless standing is granted; (2) those most directly affected by government action would benefit and would not challenge the action; (3) judicial relief is appropriate; (4) alternative remedies are not available; and (5) no one other than the party asserting the action is better suited to demonstrate an injury distinct from that of an ordinary taxpayer. *See Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986) (citing *Biester*) (granting standing

---

**16.** Initially, there was a "pecuniary" component to the standing requirement, but as acknowledge by the *William Penn* Court and other courts that followed, there is no requirement that the plaintiff suffer any pecuniary

harm. *William Penn,* 464 Pa. at 193, 346 A.2d at 281; *In re McCune,* 705 A.2d 861, 865 (Pa.Super.Ct.1997) (noting that standing does not require a "direct economic interest").

to a taxpayer challenging the constitutionality of a legislative pay raise).

This exception has been utilized by our courts to grant standing to taxpayers challenging a variety of governmental actions. For example, the courts have granted standing to taxpayers challenging judicial elections on the grounds that those elections were scheduled in a year contrary to that prescribed by Pennsylvania's Constitution;[17] to the state bar association, Pennsylvania attorneys, taxpayers and electors challenging the placement of a proposed state constitutional amendment on the ballot;[18] and to a state senator challenging the governor's failure to submit nominations to the state senate within the constitutional period.[19] The theory underlying these cases is that public policy considerations favor a relaxed application of the substantial-direct-immediate test, particularly the "direct" element that requires the party bringing the action to have an interest that surpasses that of the common people. *Consumer Party.*

■ Finally, certain public officials have standing to represent the interest of the public both under their authority as representatives of the public interest and under the doctrine of *parens patriae*. The doctrine of *"parens patriae"* refers to the "ancient powers of guardianship over persons under disability and of protectorship of the public interest which were originally held by the Crown of England as 'father of the country,' and which as part of the common law devolved upon the states and federal government." *In re Milton Hershey School Trust*, 807 A.2d 324, 326 n. 1 (Pa.Cmwlth.2002) (quoting *In re Pruner's Estate*, 390 Pa. 529, 532, 136 A.2d 107, 109

(1957)) (citations omitted). Under *parens patriae* standing, the attorney general is asserting and protecting the interest of another, not that of the Commonwealth. For example, public officials have an interest as *parens patriae* in the life of an unemancipated minor. *Commonwealth v. Nixon*, 563 Pa. 425, 761 A.2d 1151 (2000).

### III.

■ All of that leads us to the question before us: who has an interest in challenging the actions of the board of directors of a charitable trust? As mentioned above, because charitable trusts benefit a class of the public and not specific individuals, a guardian of the public interest is ordinarily charged with supervising and overseeing the administration of a charitable trust. In Pennsylvania, and all other states, for that matter, the attorney general under its *parens patriae* authority is the watch dog that supervises the administration of charitable trusts to ensure that the object of the trust remains charitable and to ensure that the charitable purpose of the trust is carried out. *Pruner's Estate.* The attorney general has the power and duty to oversee the administration of the trust and, consequently, has standing in any case involving a charity. *See* David Villar Patton, *The Queen, The Attorney General, and the Modern Charitable Fiduciary: A Historical Perspective on Charitable Enforcement Reform*, 11 U. FL. J.L. & PUB. POL'Y 131, 159–61 (2000) (outlining the historical development of charitable trust enforcement by the attorney general from 13th Century England through the American Revolution). In fact, no trust can declare itself

---

**17.** *Sprague v. Casey*, 520 Pa. 38, 550 A.2d 184 (1988).

**18.** *Bergdoll v. Kane*, 557 Pa. 72, 731 A.2d 1261 (1999).

**19.** *Zemprelli v. Thornburg*, 47 Pa.Cmwlth. 43, 407 A.2d 102 (1979).

charitable without submitting to the supervision and inspection of the attorney general, *Commonwealth v. Barnes Foundation*, 398 Pa. 458, 159 A.2d 500 (1960), and the attorney general may intervene in any action involving charitable bequests and trusts under Section 204(c) of the Commonwealth Attorneys Act.[20]

Unlike other states, however, the OAG takes the position that it has the power to oppose that which may be in the best interests of the trust and examine the effects that the actions of the trust have on the larger community. *In re Hershey School Trust*. In its petition opposing the Trust's proposed sale of its controlling interest in HFC, the OAG acknowledged that the sale would likely diversify and increase the assets of the Trust, but nonetheless objected to the sale because any sale would have profound negative consequences for the Hershey community and surrounding areas, including but not limited to the closing and/or withdrawal of HFC from the local community, together with a dramatic loss of the region's employment opportunities, related businesses and tax base. Agreeing with that view, the trial court, in that case, held that the OAG could take those views into consider-

ation and ordered that those concerns were sufficient to stop any efforts by the Trust to sell its interest in HFC. *Id.* As defined by the OAG, its role, in certain circumstances, is to protect the interests of both the beneficiaries of the Trust and the surrounding community and, where necessary, to balance those interests.[21]

While an attorney general is the only person that has automatic standing in the enforcement of charitable trusts, Pennsylvania and other states have expanded the class of plaintiffs who can intervene and challenge the actions of a charity so long as the potential plaintiff shows a "special interest" in the proceeding. Previously, it was thought that the attorney general should have the exclusive power to enforce charitable trusts (1) to protect trustees from frequent, unreasonable and vexatious litigation by parties who have no stake in the charity at all; (2) to prevent harassment; and (3) to safeguard the assets of the charity from loss due to needless litigation. *In re Nevil's Estate*, 414 Pa. 122, 199 A.2d 419 (1964); Mary Grace Blasko et al., *Standing to Sue in the Charitable Sector*, 28 U.S.F. L. Rev. 37, 41 (1993) (hereafter "Blasko"). However, criticisms of exclusive attorney general enforcement power[22]

---

**20.** Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. § 732–204(c).

**21.** Pennsylvania's version of the Uniform Prudent Investor Rule, 20 Pa.C.S. §§ 7201–7214, was amended at the behest of the OAG to require that fiduciaries (including the Trust's Board of Managers) consider:

(6) an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries, including, in the case of a charitable trust, the special relationship of the asset and its economic impact as a principal business enterprise on the community in which the beneficiary of the trust is located and the special value of the integration of the beneficiary's activities with the community where that asset is located[.]

20 Pa.C.S. § 7203(c)(6).

**22.** As Blasko suggests, "lack of resources and lack of interest ... both contribute to the current insufficiency of attorney general enforcement." Blasko et al., *supra*, at 49. Other critics conclude that state attorneys general are only equipped to handle the most egregious instances of trust mismanagement, thereby overlooking other mismanagement problems, and attorneys general infrequently and arbitrarily enforce charitable trusts. Patton, *supra*, at 164–67. Other commentators suggest that conflicts of interest in the exercise of the attorney general's *parens patriae* power add to the downfalls of exclusive attorney general enforcement. *See also* Evelyn Brody, *Whose Public? Parochialism and Paternalism in State Charity Law Enforcement*, 79 IND. L.J. 937, 946–50 (2004). Brody's arti-

gave rise to the need for courts to give third parties the ability to bring enforcement actions against charitable organizations. As Section 391 of the Second Restatement of Trusts states:

> A suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer, or by a co-trustee, *or by a person who has a special interest in the enforcement of the charitable trust, but not by persons who have no special interest* or by the settlor or his heirs, personal representatives or next of kin.

RESTATEMENT (SECOND) TRUSTS § 391 (1959) (emphasis added).

The special interest concept has been part of Pennsylvania law since the early 1950s. *See Wiegand v. Barnes Foundation*, 374 Pa. 149, 97 A.2d 81 (1953) (citing RESTATEMENT (SECOND) TRUSTS § 391).[23] In *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 426 A.2d 1123 (1981), our Supreme Court elaborated on the circumstances contemplated under the special interest doctrine that allows parties other than the attorney general to enforce a charitable trust. In that case, the Historical Society sought to restrain the trustees of the Memorial Chapel from evicting the Society from its quarters in the Chapel. The Society and the Chapel had a common settlor. Under the deed of trust, the Chapel acquired the land upon which the Society also maintained its quarters, and the land was donated to be used to advance "religious and patriotic purposes," thereby creating a charitable trust. Responding to the Society's request for equitable relief, the Chapel argued that the Society lacked standing to enforce the charitable trust because the attorney general did not participate, and he alone was the only party with standing to enforce the trust.

Noting that only the attorney general, a member of the charitable organization (i.e., a member of the Chapel), or one with a "special interest" in the trust could enforce its provisions, and noting that the Society was neither the attorney general nor a member of the charitable organization, the Court held that the Society had a special interest in the trust and had standing to petition the court for equitable relief. The Court reasoned as follows: (1) the Society and the Chapel had a close, cordial relationship, both having occupied the same building for many years; (2) the common founder of both organizations intended for both to "aid in the development of patriotism" in a religious and educational manner; (3) the Society made significant monetary contributions to the Chapel; (4) the Society, by its origins, its link to the Chapel and its professed purpose, distinguished it from any other historical society; and

---

cle outlines the role of the attorney general, the state legislature and the courts in the enforcement of charitable trusts and opines that political influence often plays a role in determining whether or not a state attorney general will become involved in the enforcement of a charity. She uses the proposed sale of HFC as an example. *See also* Mark Sidel, *The Struggle for Hershey: Community Accountability and the Law in Modern American Philanthropy*, 65 U. PITT. L. REV. 1 (2003); Komoroski, *supra* note 11, at 1785–86.

**23.** Some of the early cases merely explained that parties with interest in common to that of the general public could not have a special interest in the enforcement of a charitable trust. *In re Miller's Estate*, 380 Pa. 172, 110 A.2d 200 (1955); *Wiegand*. Other cases explained that potential beneficiaries of a charitable trust lacked a special interest in the enforcement of the trust because their interest was too speculative. *See In re Nevil's Estate*, 414 Pa. 122, 199 A.2d 419 (1964) (society for deaf and blind had no interest in *cy pres* proceedings of trust established to create asylum for deaf and blind; their interest was no different from that of the general public and were at most potential beneficiaries of the original trust).

(5) there was no risk of vexatious and unreasonable litigation by the Society.

■ Based on a review of other jurisdictions that have reached this issue, a multi-factor approach, an approach that was presaged by our Supreme Court in *Valley Forge*, is used by courts to determine whether a party has a "special interest" in the enforcement of a charitable trust:

It is clear that courts often use the "special interest" doctrine to ensure that charities are subject to some form of effective scrutiny, especially on important issues. This mechanism will increase in fairness and predictability, and consequently in value, if courts adhere to a specific formulation of the doctrine. The multi-factor test used so far by only a few courts seems to be an effective approach. It is flexible and can readily accommodate factual variations such as the level of activity of the relevant attorney general or the crucial quality of the complained-of actions. Certain factors should always play important roles. In particular, the presence of sincere allegations of managerial bad faith, and a request for a limited remedy should favor a grant of standing to private parties. A claim that the complained-of acts will have an extraordinary impact on the charity should be especially persuasive in the plaintiffs' favor. On the other hand, the authors hope that the influence of subjective social factors will wither away. *The nature of the relationship between the charity and the plaintiffs probably will remain a less easily measured factor, but the existence of a well-defined and limited group of plaintiffs who have a clear interest in the operation of the charity should favor a grant of standing.* If courts allow suits by larger groups of plaintiffs with more vague interests, they should understand that this could substantially expand the range of potential plaintiffs in charitable abuse cases.

In short, we recommend that courts explicitly adopt the multi-factor approach used in the Escondido (San Diego Boy Scouts)[24] and Alco Gravure cases.[25] This method would allow courts

24. In *San Diego County Council, Boy Scouts of America v. City of Escondido*, 14 Cal.App.3d 189, 92 Cal.Rptr. 186 (1971), the County Council of the Boy Scouts and several individual scouts brought suit to enjoin the city's proposed sale of a piece of property held in trust for the scouts' benefit. The attorney general did not participate. Using a multi-factor approach to determine whether the Council had standing to enforce the trust, the court emphasized the relationship between the plaintiffs and the charity, noting that "the administration of charitable trusts stands only to benefit if in addition to the Attorney General other suitable means of enforcement are available." *Id.* at 190. The court stated that the Council of Boy Scouts was charged by its articles of incorporation and bylaws with protecting and representing its district and the scouts within, and the court stated that it could "think of no more responsive or responsible party to represent the boy scouts of the Palomar District in such litigation." *Id.* at 190.

25. In *Alco Gravure, Inc. v. Knapp Foundation*, 64 N.Y.2d 458, 490 N.Y.S.2d 116, 479 N.E.2d .752 (1985), potential beneficiaries of a charitable trust sued to prevent a non-profit corporation from transferring its assets to another charity with a similar, but not identical, purpose. The court first noted that both the attorney general and a trial judge approved the transfer of assets and implied that it would deny standing to a private plaintiff challenging the administration of a charity. However, it recognized that the individual plaintiffs' status as preferred beneficiaries would be eliminated had the transfer occurred. Using a multi-factor approach, the court held that because the remedy sought was to preserve the existence of the charity itself, because the benefited class was small and identifiable, and because beneficiaries would be directly harmed by the transfer of

to grant standing to private plaintiffs needed to keep charities accountable on important matters while avoiding excessive and undesirable litigation burdens on those charities, all with greater consistency and predictive value than is currently the case.

Blasko et al., *supra*, at 83–84 (internal footnotes omitted) (emphasis added).

Blasko's article concludes that the following five factors "consistently influence a court's willingness to allow a private party to sue for the enforcement of charitable obligations": (1) the extraordinary nature of the acts complained of and the remedy sought; (2) the presence of fraud or misconduct on the part of the charity or its directors; (3) the attorney general's availability or effectiveness; (4) the nature of the benefited class and its relationship to the charity; and (5) subjective, case-specific circumstances. Blasko et al., *supra*, at 61–78 (adopted with modification by *Robert Schalkenbach Foundation v. Lincoln Foundation, Inc.*, 91 P.3d 1019, 208 Ariz. 176 (Ct.App.2004) ("[W]e give special emphasis to ... the nature of the benefited class and its relationship to the trust, the nature of the remedy requested, and the effectiveness of attorney general enforcement of the trust.")).

Guided by the reasoning in *Valley Forge*, we will utilize this multi-factor test to determine whether the Association has standing under the special interest doctrine. This approach is consistent with the concern in *Valley Forge* of preventing unnecessary litigation involving charities and the concern of assuring that the philanthropic purpose of any given charity is carried out, notwithstanding the extent of the involvement by the attorney general. This approach also assures judicial scrutiny in situations where important charitable issues are at stake and where the attorney general's involvement is otherwise lacking, ineffective or conflicted. Finally, this approach is consistent with the general purpose of standing law—to protect against improper plaintiffs—by specifically emphasizing the special relationship between the plaintiff seeking enforcement of the trust and the trust itself. *Valley Forge*.

## IV.

■ The Association argues that it has met the special interest test for challenging the modification of the July 2002 Reform Agreement.[26] The Association points out that it was instrumental in bringing to the OAG's attention the substantial growth in Trust assets (exceeding $5 or $6 billion) concomitantly with a decrease in the number of orphan children served. In addition, the Association also raised concerns about potential conflicts of interest amongst the Trust directors and potential mismanagement of trust funds that led to a decline in serving orphan children at the School. The Association was instrumental

the assets, the plaintiffs had a special interest sufficient to challenge the transfer.

**26.** The Association also contends that it meets the general direct-immediate-substantial test for standing because (1) its vast efforts to secure the July 2002 Reform Agreement at the OAG's request and the subsequent rescission resulted in direct harm to the Association; and (2) and its unique dual purpose of assuring the bonds developed in orphanhood and assuring that the purpose of the Trust is carried out is essential to the existence of the Association. The Association alternatively argues that it meets the taxpayer exception to the general direct-immediate-substantial test because (1) rescission of the July 2002 Reform Agreement will go unchallenged were we to refuse standing; (2) judicial relief is appropriate; (3) other relief is not available; and (4) the Association is in the best position to seek reinstatement. We need not reach these issues in light of the manner in which we resolve standing in this case.

in having the OAG seek the July 2002 Reform Agreement that sought to remedy these problems, problems that were acknowledged by the OAG, by eliminating conflicts of interest, by reworking admissions and academic standards, by restricting land transfers and sales, and by requiring status reports to the OAG. Given the nature of these events, given the enormous amount of money at stake, and given that the Association merely seeks to determine whether the July 2002 Reform Agreement will better serve the charitable purpose of the Trust instead of the June 2003 Agreement struck by the OAG, the School, and the Trust, the Association has pled a special interest in this matter.

The Association also has a special interest because of its relationship with the benefited class and the charity itself. Similar to the Historical Society in *Valley Forge*, the Association has historically maintained a close, cordial relationship with the Trust for over 70 years, and it has made monetary contributions to the School on a number of occasions. The members of the Association are all successful participants of the School, and the Association has its office on Trust lands where it conducts student-related activities and graduate assistance programs for students at the School. The Association was created by Mr. Hershey, settlor of the Trust, and the Association's articles of incorporation and bylaws require that it maintain the common bonds formed during orphanhood and preserve the charitable, child-saving purpose of the Trust. In addition, the Association is particularly well-suited to evaluate the performance of this Trust because of its intimate knowledge of orphanhood, poverty and other alternative foster care facilities. At bottom, the Association, whose membership consists exclusively of past beneficiaries of the Hershey Trust, is the only other party with a sufficient relationship to the Trust that would have any interest in assuring that its charitable purpose was achieved.

Furthermore, the risk of vexatious or unreasonable litigation by the Association is virtually non-existent in this case. This is not a situation where a mere potential beneficiary with a speculative interest in the charity is seeking to interfere with the administration of the Trust or where a member of the general public is disagreeing with the administration of the Trust. This is also not a situation where the Association wishes to drain Trust assets by litigating each and every decision made by trust managers. The Association only seeks the reasons why the July 2002 Reform Agreement was replaced by the June 2003 Agreement when the Reform Agreement was the result of an extensive investigation funded in part by the Association to aid the OAG, which concluded that potential conflicts of interests amongst trust managers and potential asset mismanagement interfered with the Trust's charitable mission. That inquiry is neither vexatious nor unreasonable. Given the nature of this Trust, its status as the largest residential childcare charity in the world, and the fact that the OAG agreed to modify the July 2002 Reform Agreement, this scrutiny will serve the public interest in assuring that the Trust is operating efficiently and effectively to serve its beneficiaries.[27]

---

**27.** Because of the Association's overwhelming special interest in the underlying proceeding, we need not address the OAG's position that it balances the interests between the objects of the trust and the community at large as to whether there is standing on behalf of the Association. In certain circumstances, this balancing of interests will present a conflict of interest for the OAG because certain undertakings of the Trust could affect the community, positively or negatively, but undermine the central purpose of the Trust, which is to help orphan children get out of poverty and get

Accordingly, because the Association has a "special interest" in this proceeding, it should have been allowed to challenge the modification of the July 2002 Reform Agreement, and for the foregoing reasons, the order of the trial court is reversed and the matter is remanded for hearings on the Association's petition.

## *O R D E R*

AND NOW, this 31st day of January, 2005, the order of the trial court in the above-captioned matter is reversed and the matter is remanded for hearings on the Association's petition.

Jurisdiction relinquished.

Dissenting Opinion by President Judge COLINS, joined by Judges COHN JUBELIRER and SIMPSON.

Dissenting Opinion by President Judge COLINS.

I must respectfully dissent from the majority opinion while, at the same time, comment that it is one of the finest pieces of legal scholarship that I have read in my 25 years on the bench.

The reasons for my dissent follow briefly.

As noted on page 677 of the majority opinion:

As directed by the deed of trust, the members of the School's Board of Managers are also members of the Board of Directors of the Trust Company. The deed endows the Board of Managers and the Trust Company with decision-making responsibility for all aspects of running the School and for management and administration of Trust assets.

Further, the majority opinion continues on page 678 to state:

into a suitable living and educational environ-

The Association is not a division of the School or of the Trust Company. It is not named in the deed of trust and is not an intended beneficiary of the Trust. As the deed states, "[a]ll children shall leave the institution and cease to be the recipients of its benefits upon the completion of the full course of secondary education being offered at the School." (Reproduced Record at 25a). The Managers of the Trust may, in their discretion, contribute to the higher education of a graduate of the School, in which case graduates would continue to be beneficiaries of the Trust, but generally, once orphans graduate from the School, they are no longer Trust beneficiaries.

Unfortunately, this is where this Court's inquiry must end. It is clear from the historical background of this saga that the Settlors in no way intended to give the Alumni Association standing in the administration of the Trust. The Settlor, Milton Hershey, was also the creator of the Alumni Association. To now give the Association legal rights that were expressly excluded by the Settlor of the Trust is a dangerous expansion of standing not supported by over 300 years of case law within the Commonwealth.

The Attorney General of the Commonwealth, pursuant to well-accepted principles of *"parens patriae,"* as noted by the majority:

is the watch dog that supervises the administration of charitable trusts to ensure that the object of the trust remains charitable and to ensure that the charitable purpose of the trust is carried out. *Pruner's Estate.* The attorney general has the power to oversee the administration of the trust and, consequently, has standing in any case involving charity. *See* David Villar Patton, *The Queen, The*

ment.

*Attorney General, and the Modern Charitable Fiduciary: A Historical Perspective on Charitable Enforcement Reform,* 11 U. Fl. J.L. & Pub. Pol'y 131, 159–61 (2000) (outlining the historical development of charitable trust enforcement by the attorney general from 13th Century England through the American Revolution).

To allow the Alumni Association standing, no matter how eleemosynary its purpose may be, interferes with the efficient performance of the Attorney General's statutorily-mandated duties, as well as being violative of the wishes of the Settlor of the Trust and founder of the Alumni Association.

Such a quantum leap away from historical concepts of standing, based upon public policy considerations, and a judicially-created "special interest," may only be undertaken by the Supreme Court of the Commonwealth.

Judge COHN JUBELIRER and Judge SIMPSON join in this dissent.